# WHEELING.

WEST VIRGINIA TRANSPORTATION CO. *v.* OHIO RIVER PIPE LINE CO. *et als.*

Submitted September 15, 1883—Decided November 17, 1883.

(*JOHNSON, PRESIDENT, Absent.)

1. An oil transportation company entered into an agreement with a land-owner, whereby the land-owner for a valuable consideration granted to the company and their assigns the *exclusive* right of way and privilege to construct and maintain one or more lines of tubing for the transportation of oil through and under a tract of land containing two thousand acres, which agreement was signed, sealed and delivered by the land-owner. HELD :

   By the true construction of this instrument it operated first as a grant of right of way for such tubing for the transportation of oil through said tract of land, and secondly, it was intended to operate as a covenant, whereby the land-owner agreed, that he would not himself transport oil from or through this tract of land nor grant rights of way to any other person or company to lay tubes for the transportation of oil through said tract of land, whether the oil was produced on said tract of land or not.   (p. 616.)

2. Such agreement was valid and binding on the land-owner and his assigns, so far as it operated as a grant of right of way for such tubing through said tract of land, but so far as it was intended to operate as a covenant, that the land-owner would not himself transport oil from or through said tract of land nor grant rights of way to any other person or company to lay tubes for the transportation of oil through said tract of land whether the oil was produced upon it or not, this agreement was inoperative, null and void as contrary to public policy, being an attempt to impose an unreasonable restraint upon trade.   (p. 617 )

3. As a general rule any trade or business may legally have imposed on it by contract a *partial* restraint, as the extent of territory, over which it is permitted to extend. Such restraint, when valid, varies with the character of the trade or business.   In some sorts of trade or business it may be a large extent of country, hundreds of miles in dimensions, in which a party may contract not to carry on his business ; but in other sorts of business the restraint would not be valid, if it were attempted by the contract to extend it beyond the bounds of a single town ; and there are some sorts of business, which the law will not allow to be restricted at all by contract.   (p. 618.)

*Interested party.

4. Whenever the Legislature by statute-law has authorized any person or corporation to condemn the lands of others in order to carry on its business, the courts will regard this as a legislative declaration, that this character of business is such, as that the public has so great and direct an interest in, that the courts must hold it as contrary to public policy to permit any restriction of it by private contract.   (p 625)

5. A contract, by which an *exclusive* right of way is granted through any land, however small the parcel, is void, so far as the right is attempted to be made exclusive, as contrary to public policy and as in direct conflict with the State's right of eminent domain. (p. 627.)

6  A landlord may by contract under seal impose on the lands, which he leases, burdens, which will not only be binding on the tenant but also on sub-tenants, they being covenants real running with the land.  But except between landlord and tenant no burdens can be imposed on lands by any covenant of the owner, which will run with the land and bind any grantee of the land ; for such covenants are personal and are not covenants real running with the land.  (p 632.)

7. An agreement by a land-owner, that the products of his land shall be transported to market by a certain common carrier, is not a covenant real and does not run with the land or bind any subsequent purchaser of the land.   (p. 632.)

8. A court of equity would not enforce the performance of such covenants by a subsequent purchaser of the land, though he bought the land with full notice of the existence of such covenant. (p. 636.)

Green, Judge, furnishes the following statement of the case:

The West Virginia Transportation Company, a corporation chartered by several acts of the Legislature of West Virginia, on August 7, 1882, presented its bill of injunction to to the judge of the circuit court of Ritchie county, in which it alleged, that it was incorporated as an internal improvement company by three acts of the Legislature of West Virginia, passed respectively on February 26, 1867, (Acts of 1867, chapter 95,) February 26, 1868, (Acts of 1868, chapter 67,) and February 9, 1869, (Acts of 1869, chapter 10).   By its original charter, section 4, page 111, "The said company was authorized to purchase real estate and erect buildings and improvements thereon and use and hold the same; and

76

further to have the right to purchase all necessary equipments and appendages, such as tubing, pumps, tanks, telegraph apparatus and all needful appliances appertaining thereto as may be necessary for the transportation of oil through said tubing and branch-pipes for the accommodation, convenience and purposes of said company." By section 5 the said company was authorized by condemnation to acquire the right of way or fee simple in the land. Section 7 regulated its charges for the transportation of oil through such tubing. The Legislature by section 12 reserved the right to alter, amend or repeal this act. By chapter 67 of Acts of 1868, page 63, this charter was amended and "said company authorized to construct and maintain a line or lines of tubing, for the purpose of transporting petroleum or other oils through pipes of iron or other materials, in the counties of Wirt, Wood, Ritchie and Pleasants, to any railroad or other road or to any navigable stream or streams in or adjoining the counties aforesaid, and to transport from the terminus of said pipe or pipes petroleum or other oils in tanks, cars, boats or other receptacles belonging to said company, and to receive and hold said oil on storage, and to buy and sell said oils on commission or otherwise. And also power to enter and condemn lands and to acquire rights of way in the counties aforesaid, for the purposes of said company; and in such cases, when it may be deemed advisable by said company, it shall at its option have the power to acquire a sufficient right of way only for the purposes of said improvement over any such lands instead of the fee simple thereof." The act of February 9, 1869, provided the details, by which said company was to acquire by condemnation rights of way in said counties or the fee simple of lands, and provided that when the required steps had been taken, "the company shall hold the right of way or rights of way over, under or through the said lands or the fee simple as aforesaid, by good and indefeasible title."

The bill then states, that pursuant to the authority thus conferred upon this company it made on September 2, 1868, the following contract with E. L. Gale and Mary Gale:

"We, the undersigned, for and in consideration of the sum of one dollar, receipt of which is hereby acknowledged, do

hereby grant unto the West Virginia Transportation Company, a company incorporated under special act of the Legislature of West Virginia, passed February 26, 1867, and their assigns, the right of way to construct and maintain one or more lines of tubing for the transportation of oil along, through and under lands owned by the undersigned in Ritchie county, in the State of West Virginia; also the right to construct and maintain a telegraph along said tubing and the privilege to remove said tubing and telegraph at pleasure.

"Witness our hands and seals this 23d day of September, 1868.

"E. L. GALE,   [SEAL.]<br>
"MARY GALE, · [SEAL.]"

The bill further alleges that subsequently on January 31, 1870, and October 25, 1873, said E. L. Gale and Mary Gale, his wife, granted to said company the *exclusive* right of way and privilege to contract and maintain one or more lines of tubing for the transportation of oil, water or other liquids along, through and under lands owned by them in the counties of Ritchie and Wood, also the right to construct and maintain a telegraph along said tubing and the privilege to remove said tubing at pleasure, which deeds are duly admitted to record. The two deeds were in all respects similar and the following is a copy of one of them:

"We, the undersigned, for and in consideration of the sum of one dollar, receipt of which is hereby acknowledged, do hereby grant unto the West Virginia Transportation Company, a company incorporated under special act of the Legislature of West Virginia, passed February 26, 1867, and their assigns, the exclusive right of way and privilege to construct and maintain one or more lines of tubing for the transportation of oil, water or other liquids along, through and under lands owned by the undersigned in Ritchie county in the State of West Virginia; also the right to construct and maintain a telegraph along said tubing, and the privilege to remove said tubing and telegraph at pleasure.

"Witness our hands and seals this 31st day of January, 1870.

"E. L. GALE,   [SEAL.]<br>
"MARY GALE,   [SEAL.]"

The bill then alleges, that the lands mentioned in these three deeds were comprised in a tract of about two thousand acres lying principally in Ritchie county and known as the "Gale tract;" that acting under these deeds the company laid lines of tubing, erected pumping stations and tanks and other necessary appliances on said "Gale tract" to all the oil wells on said tract of land, said lines of tubing being several miles in extent and furnishing means of transportation for the oil produced from every well or set of wells upon said "Gale tract," the value of the tubing and property of said company amounting now to several thousand dollars. The bill alleges further, that since 1869 the company has furnished complete and efficient transportation for the oil produced from all the wells on said tract; that it has connected its tubing lines with its other lines, by which transportation for said oil is afforded to Parkersburg and to the Baltimore and Ohio railroad at Petroleum and Laurel Junction. The bill then proceeds to state, that on June 3, 1882, the Secretary of State of West Virginia issued to the Ohio River Pipe Line Company a charter duly recorded, whereby the incorporators agreed to become a corporation under that name for the purpose of transporting carbon, petroleum or rock oils by pipe laying in the counties of Ritchie, Wood and Pleasants for all persons, who shall deliver to said corporation such oils in quantities not less than fifty barrels, at such rates of transportation as may be designated by said corporation, not to exceed the maximum rate for such service as now prescribed by law. For which purpose said corporation should lay a line or lines of pipe or tubing from, at or near Petroleum station in Ritchie county on the Parkersburg branch railroad along and through what is known as the oil-belt or oil district in said Ritchie and Wood counties in a northwesterly course through said counties to a point in the city of Marietta in the State of Ohio; and to lay a line or lines of pipe or tubing from any point on its main line in either side thereof and connecting with the oil-wells and points of oil-storage in said district or belt in said counties of Wood and Ritchie and extending the same to the oil-district of Pleasants county.

The bill charges, that this Ohio River Pipe Line Company thus chartered for these purposes by Thompson Leach and

the Wood County Petroleum Company, by some combination intended as a blind to the acts of the Ohio River Pipe Line Company, have entered upon this "Gale tract" of land with the avowed object and purpose of laying and constructing a line of pipe or tubing for the transportation of the oil produced thereon, and that in furtherance of their said designs they have brought thither and placed upon said tract of land a lot of pipe or tubing in order to lay down and construct said line of pipe or tubing, and have already laid a portion of said line upon said tract of land, and are continuing to lay said line of pipe or tubing for the purpose aforesaid; that the said Ohio River Pipe Line, Company and said persons associated with it are proceeding in this manner without the consent or permission of the West Virginia Transportation Company, without any proceeding to condemn said land according to law, and, as the complainants allege, without any lawful authority whatsoever, and, they say, in violation of rights vested in them by their charters and deeds before mentioned.

The bill states, that this Ohio River Pipe Line Company has no property in this State except a small amount of tubing, and that a judgment against it would be unavailing; and the bill therefore asks, that the Ohio River Pipe line Company and certain named persons in business as the Wood County Petroleum Company and Thompson Leach be made defendants, and that the said Ohio River Pipe Line Company and each of these defendants may be enjoined and restrained and prohibited from laying and constructing any line of pipe or tubing for the transportation of oil upon and from said tract of land known as "the Gale tract" and from removing and transporting through any such line any oil now produced or that hereafter may be produced on said tract of land, or from interfering in any manner with the sole and exclusive right thereon acquired by the complainant by its deeds; and that such injunction be perpetuated, and asking for general relief.

The bill was sworn to and the injunction awarded as prayed for upon the complainants giving bond in the penalty of five hundred dollars conditioned as required by law. Which bond was accordingly given.

The defendants demurred to the bill, and also filed their

joint and several answers. They admit, as stated in the bill, the charters of the complainants and the deeds made to it by E. L. Gale and Mary Gale his wife. The answer then states, that E. L. Gale and Mary Gale by a deed, a certified copy of which is filed with the answer, conveyed to the defendants the natural persons on June 20, 1875, an undivided one half interest of, in and to at least one thousand acres of said " Gale tract" bounded as follows (giving its boundaries), containing one thousand acres, being the side .of said tract nearest to Volcano; that the grantees in said deed were authorized to grant leases .on said one thousand acres of land for the purpose of mining for coal or oil or other minerals or products or cutting timber, but no leases were to be granted for a less royalty than one fourth of the production; that this deed and agreement were executed by all the parties grantors 'and grantees and duly acknowledged by all of them and duly recorded as to all of them.

The answer further states, that afterwards, to-wit, on April 4, 1877, by deed of that date said E. L. Gale and Mary Gale his wife, conveyed to the said natural persons, defendants, an additional one undivided eighth part of the said one thousand acres, thus investing them with five undivided eighths of said one thousand acres of land, an attested copy of which deed is filed with said answer; that these natural persons use the name "Wood County Petroleum Company" for convenience in running this one thousand acres of land and the business connected therewith, and that Thompson Leach is their appointed agent and manager thereof; that large quantities of valuable oil or petroleum have been for years and are now produced from their one thousand acres of land by tenants under leases, which run for twenty years, and of this, one hundred acres has been and is leased and worked by the Oil Run Petroleum Company; that the income and profits of the defendants from this one thousand acres of land would be greatly increased by a speedy, careful, fair and rightful transportation of their royalty-oil to market upon reasonable and lawful terms and at reasonable and lawful rates. The answer denies that the plaintiff has furnished or does now permit transportation from every well or set of wells on said tract of one thousand acres of land for

the oil produced therefrom, and also denies, that the plaintiff furnished careful, fair and rightful transportation upon reasonable and lawful terms and at reasonable and lawful rates for the royalty-oil accruing to the defendants from the production of said tract of land. On the contrary these answers affirm, that the said plaintiff refuses to receive said royalty-oil of the tenants on said tract of land, and to obligate itself to deliver oil of like or equal gravity and value therefor, but it has established an arbitrary system of (socalled) grades of oil to be delivered by it, whereby within the same grade are comprehended oils of different values and gravities, whereby shippers are compelled to suffer loss, and the defendants have by this and other specified conduct of plaintiff suffered great loss; and especially that the plaintiff as a common carrier of oil has exacted of the defendants toll in excess of what is authorized by the statute-law, and that the plaintiff also deducted more for evaporation of such oil while on storage with the plaintiff than is allowed by statute-law; that because of these just complaints the defendants determined to forward their own royalty-oil to market by some other route, and to this end to provide for its transportation from said tract of one thousand acres to Petroleum station on the B. & O. railroad, a distance of less than three miles, which they could do at much less cost and without these annoyances and exactions, and that thereupon the said Wood County Petroleum Company, before the granting of said injunction, purchased from the Ohio River Pipe Line Company a lot of pipe or tubing sufficient to lay or construct a line from their tanks on this tract of one thousand acres to the boundary of this tract, and they had about completed laying the same, when this injunction was awarded; that it was not their purpose to construct this line of tubing beyond the boundary of said one thousand acres, but to connect it with the line of tubing extending to said Petroleum station; but they had no contract with said Ohio River Pipe Line Company on the subject, nor did said company take any part in laying said tubing on this one thousand acres, nor has it any interest therein; that it was not necessary or proper to ask the consent or permission of the plaintiff to lay or construct said line of tubing on these one thousand acres, because this

was the land of the defendants, and they not being a corporation, no condemnation proceedings were either necessary or proper; that this tubing laid and intended to be laid by the defendants does not in any way interrupt or obstruct any tubing-lines of the plaintiff or the operation of the same.

The defendants claim that the plaintiff has not by its charters or deeds filed with the bill any vested rights or privileges, that are or will be interfered with or violated by the laying or constructing of the said line of pipes or tubing by the defendants. They deny that these deeds to the plaintiff are binding on them, because they are without valuable consideration, because they do not describe any land, along, through or under which the right of way therein mentioned is pretended to be granted, and because the same are otherwise too vague and uncertain, and these pretended *exclusive* grants are inconsistent with the retention of the fee simple. They also deny that they had any notice of said pretended grants of right of way or any of them, when they so purchased, and aver that the recording of said grants was no notice to the defendants, because there is no description of the land in said pretended grants. They admit that the Ohio Pipe Line Company is a corporation as stated, but deny that it has any interest in the tubing line, which was being laid, when the injunction was awarded. There was a general replication to their answer.

The Ohio River Pipe Line Company also filed its answer. It admits its organization as a corporation as stated in the bill, and it alleges that it sold to the persons composing the Wood County Petroleum Company two thousand feet of tubing, which said company laid down on their own land, a part of this "Gale tract," but that the Ohio River Pipe Line Company had, when this injunction was awarded, no interest in this piping, nor has it now, and it did not in any way aid in laying the same down. The other portions of this answer are the same as those taken in the answer of the other defendants.

Numerous depositions were taken by both parties. The plaintiff's depositions proved, that the consideration, which it gave for the *exclusive* right of way through this "Gale tract," was an undertaking on its part to furnish all neces-

sary and proper facilities for transporting by pipe-lines all the oil produced on the "Gale tract" to Petroleum; and that this had been done. Mr. Gale stated, that he had been unable to develop the tract because of a want of transportation facilities, and he could get no one to advance money to build pipe-lines, till production of oil on this tract was first assured; that he offered, if it, the plaintiff, would undertake to build pipe-lines on this tract, he would give it *an exclusive* right of way, which would guarantee to it transportation through the pipe-lines when laid; that the plaintiff on this assurance and guarantee built the pipe-lines on this "Gale tract," connecting it with Petroleum; that without this *exclusive* grant of a right of way the plaintiff never would have built the pipe-lines; and that it had occupied and used these lines for fourteen years, and that no one else had claimed a right to lay other pipe-lines during that period.

On the back of the receipts given for oil transported in these pipes are many minute conditions as to the terms, under which the transportation is made by the plaintiff, and which are complained of as unjust; but which it is not deemed necessary to here state. The plaintiff's evidence proved that the Ohio River Pipe Line Company had laid down some pipe-lines on this "Gale tract" of land.

The defendants, the parties constituting the Wood County Petroleum Company, proved that they had laid down pipe-line on their one thousand acres of land; that it was of advantage to them to have their separate pipe-lines under their own control so as to avoid the mixing of oils of different grades; and that this piping on this one thousand acres was laid by the persons constituting the Wood County Petroleum Company and not by the Ohio River Pipe Line Company; but that it did connect with the pipe-line of the Ohio River Pipe Line Company; that plaintiff's company refuses to transport cold test oil through its tubing-line with a guarantee by it that it will deliver oil of the same cold test quality to the consignee; that the classification of oil by the plaintiff mixes oils of different degrees of gravity and of different market value into one so-called grade; that this is to the loss of the producers of oil; if for instance the producer ships oil of thirty-one gravity, he is compelled to accept a shipping re-

ceipt of six grade oil, which includes all oil between thirty-one and thirty-three gravity, and which may be satisfied by the company's delivering thirty-three gravity which is worth at least one dollar per barrel less than thirty-one gravity; that the line of tubing of the persons constituting the Wood County Petroleum Company was connected with the line of tubing of the Ohio River Pipe Line Company just on the edge of the tract of one thousand acres, a part of the "Gale tract" owned by the Wood County Petroleum Company.

This last company complain, that they are charged twice as much as the law allows by the West Virginia Transportation Company, which it denies.

Exceptions were filed by the plaintiff to the answer of the defendants, first to that part of it complaining that the plaintiff mixes oils of different grades to the prejudice of the defendants as shippers, because all the allegations in reference thereto are impertinent and immaterial in this cause; and secondly, if true, would constitute no defence in this suit; third, because these allegations are so vague and uncertain as not to notify the plaintiff of the charge against it; fourth, because a court of equity has no jurisdiction over the question of *unliquidated* damages involved in these charges of defendants; and lastly, because for these charges, the defendants' remedy is a suit at law. In the next place the plaintiff excepts to so much of the defendants' answer, as charges that the plaintiff has violated and is violating its charter and the law in various exactions and charges specified in the answer, first, because these charges and allegations are immaterial in this cause; and secondly, constitute no defence; and third, because they are so vague and uncertain as not to give the plaintiff fair notice of what is complained of against it; fourth, because the act of March 4, 1879, relied on in the answer does not and cannot control the plaintiff in its charges; and fifthly, if it was binding on the plaintiff, it is the sole province of the State of West Virginia to enforce it by *quo warranto*; sixth, because a court of equity has no jurisdiction over a question of *unliquidated damages*; and lastly, because, if the allegations and charges were true, the defendants have a full remedy at law. These exceptions were overruled by

the circuit court; and the plaintiff then filed a general repli-
cation to this answer.

On November 13, 1882, the said circuit court of Ritchie
county entered the following final decree in this cause:

"This cause having been regularly set for hearing on
motion of the plaintiff as to all the defendants, the cause
came on to be heard on this day upon the bill and exhibits
filed therewith, the demurrer of the defendants, Thompson
Leach, W. Vrooman, H. H. Moss and C. H. Shattuck, the
separate demurrer of the defendant, The Ohio River Pipe
Line Company, the answer of the defendants, Thompson
Leach, W. Vrooman, H. H. Moss, C. H. Shattuck and Agnes
M. Stephenson, administratrix with the will annexed of
James M. Stephenson, deceased, and the exhibits filed there-
with, and the general replication thereto, the separate answer
of The Ohio River Pipe Line Company, and the general re-
plication thereto, the depositions taken in the cause on behalf
of the plaintiff, and on behalf of the defendants, and upon
the motion heretofore made by the defendants to dissolve the
injunction awarded the plaintiff in this cause on the 5th day
of August, 1882, and the former orders made herein, and
was argued by counsel. On consideration whereof, it is ad-
judged, ordered and decreed that the said injunction so
awarded the plaintiff in this cause as aforesaid be and the
same is hereby dissolved, and that the bill of the plaintiff be
dismissed, and that the plaintiff pay to the defendants their
costs by them about their defense in this behalf expended."

From this decree the West Virginia Transportation Com-
pany has obtained an appeal and *supersedeas*.

*Walter S. Sands* for appellant.

*A. I. Boreman* for appellees.

Green, Judge:

The real question involved in this case is: Should the
courts at the instance of the West Virginia Transportation
Company enforce the grants and contracts made with it by E.
L. Gale and wife dated respectively January 31, 1870, and
October 23, 1873? These two contracts are identical in lan-

.guage, except that the first applied to lands in Ritchie county
and the second to lands in Wood county adjoining. The
first of these contracts is in the following language:

"We, the undersigned, for and in consideration of the sum
of one dollar, receipt of which is hereby acknowledged, do
hereby grant unto the West Virginia Transportation Com-
pany, a company incorporated under special act of the Legis-
lature of West Virginia, passed February 26, 1867, and their
assigns, the *exclusive* right of way and privilege to construct
and maintain one or more lines of tubing for the transporta-
tion of oil, water or other liquids along, through and under
lands owned by the undersigned in Ritchie county in the
State of West Virginia; also the right to construct and main-
tain a telegraph along said tubing, and the privilege to re-
move said tubing and telegraph at pleasure.

"Witness our hands and seals this 31st day of January,
1870.

                    "E. L. Gale.        [seal.]
                    "Mary Gale.        [seal.]"

It was duly acknowledged and admitted to record in
Ritchie county on March 15, 1870.

When these grants and contracts were made, Mary Gale,
the wife of E. L. Gale, owned a tract of land lying partly in
Wood and partly in Ritchie county, West Virginia, contain-
ing about two thousand acres, which had been conveyed to
Mary Gale, the wife of E. G. Gale, as long ago as March 7,
1854. Subsequently to the recordation of said grants and
contracts of January 31, 1870, and October 23, 1873, that is
on January 26, 1875, said Gale and wife in consideration of
eight thousand one hundred and forty-six dollars and fifty-
six cents conveyed to James M. Stephenson, Thompson
Leach, W. Vrooman, C. H. Shattuck and H. H. Moss a
moiety of one thousand acres of this land with general war-
ranty of title, which deed was duly recorded on July 6, 1875.
These grantees afterwards for convenience in managing said
property assumed the name of the Wood County Petroleum
Company. They claim, that, if these grants and contracts of
date January 31, 1870, and October 23, 1873, were binding
grants and contracts, which the courts would enforce between
the original parties to them, nevertheless they would not be

enforced against them, as they were purchased for valuable consideration without notice of their existence; and they insist, that the recordation of these grants and contracts cannot be regarded as giving them any constructive notice of their existence, because they profess to grant "*exclusive* rights of way and privilege to contract and maintain one or more lines of tubing for the transportation of oil along, through and under *lands owned by the grantors in Ritchie and Wood counties in the State of West Virginia;*" that this description of the lands, through which said rights of way were granted, is so utterly *vague and indefinite*, that it would not operate when recorded as any constructive notice to a subsequent purchaser without notice, as they claim to be. To sustain this position they rely on *Munday* v. *Vawter*, 3 Gratt. 518, and *Carrington* v. *Goddin*, 13 Gratt. 609.

On the other hand the description of the land contained in these grants and contracts, the West Virginia Transportation Company insist, is legally equivalent to "all the lands owned by Gale and wife in Ritchie and Wood counties," and this being the legal signification of the description of the land in these grants and contracts, that the recordation of them was constructive notice to every one of the existence of these grants and contracts. To sustain this they rely on *Warren* v. *Syme*, 7 W. Va. 474. They also insist, that, even if this were not so, the evidence shows, that they were after the making of said grants and contracts in the actual possession of all this "Gale tract," so far as the exclusive possession and control of many lines of tubing through it was concerned, and that subsequent purchasers of any portion of this "Gale tract" were bound to enquire into the nature of their possession; and had they done so, they must have discovered, that they claimed the *exclusive* right of way for tubing to transport oil either through this tract or such as was produced upon it; and therefore they are chargeable with implied notice of the claim of The West Virginia Transportation Company. To sustain this position they rely upon *Daniels* v. *Davison*, 16 Ves. 249; *Wilson* v. *Wall*, 6 Wall. 83; *French* v. *Loyal Co.*, 5 Leigh 627; *Campbell* v. *Fetterman's Heirs*, 20 W. Va. 398.

From the views I take of this case I deem it unnecessary

to consider or determine, whether the persons known as the Wood County Petroleum Company are or are not to be regarded as having either constructive or implied notice of these contracts and grants by Gale and wife with and to the West Virginia Transportation Company. As all questions involved in this cause can be determined without considering this question and by confining our attention to the question, whether the courts ought to enforce in favor of the West Virginia Transportation Company these grants and contracts as against the original obligors and grantors, we will consider this latter question only.

These grants and contracts are on their face ambiguous; and it has been held, that, when this is the case, the courts will look at the surrounding circumstances existing, when such ambiguous contracts were made, at the situation of the parties and the subject-matter of the contract, and sometimes even call in aid the acts done by the parties under such contracts, as affording a clue to the intention of the parties; but the court never resorts in such cases to the verbal declarations of the parties either before or after or at the time of the execution of the contracts to aid it in construing its language. See *Crislip's Guardians* v. *Cain,* 19 W. Va. page 483, and the authorities there cited.

The contracts were in the case before us made respectively on July 31, 1870, and October 23, 1873. The parties to them had made on September 23, 1868, another contract in precisely the same language, except that by it was granted "the right of way to construct and maintain one or more lines of tubing for the transportation of oil along, through and under lands owned by them in Ritchie county," while these new contracts under consideration granted instead of such "right of way" an "exclusive right of way." When these contracts were made the grantors owned a large tract of land of about two thousand acres in Ritchie and Wood counties, West Virginia, which was and for a long time had been very productive in valuable petroleum oil. The land had been divided into small lots and leased to numerous parties for terms generally of twenty years, who sunk wells on their respective lots paying as a royalty or rent for working such wells one fourth of the oil produced from them. The production of oil from

these wells was some twenty thousand barrels a year and there were upon it some fifty tenants.    The oil produced each year was worth from sixty to one hundred thousand dollars. On Februrury 26, 1867, (Acts of 1867 p. 110,) the Legislature of West Virginia had incorporated the West Virginia Transportation Company with the right to "lay out and conduct a line or lines of tubing for the purpose of transporting oil through the same in, through or along the oil district in the county of Wirt."    This charter had been amended February 20, 1868, (see Acts of 1868, pp. 63 and 64), so that the company organized under this act of February 20, 1867, was authorized "to construct and maintain a line or lines of tubing for the purpose of transporting petroleum or other oils through pipes in the counties of Wirt, Wood, Ritchie and Pleasants.    And the said company shall have power to enter and condemn lands and to acquire right of way in the counties aforesaid for the purposes of said company in the manner prescribed by the fifty-sixth chapter of Code of West Virginia."    And on February 9, 1869, (see Acts of 1869, p. 8) the charter of this company was again amended and it was declared said company should "have power to construct or maintain pipes or tubing together with all necessary and proper machinery, telegraphs, buildings and other appurtenances, for the purpose of transporting petroleum or other oils or liquids through such pipes or tubing; and said company shall also have the right to construct, own and run tank-cars, boats and other receptacles for the transportation of petroleum or other oils or liquids and to receive and hold such petroleum or other oils in storage and to buy and sell the same on commission or otherwise."    Said act further provided the means and manner whereby lands might be condemned and rights of way acquired in said counties for constructing such pipe-lines and works.

When oil was first struck on this Gale tract, he induced this company to lay a line connecting this tract with Petroleum.    He then with his wife executed the contract and grant, whereby he gave said company a right of way through said land; but this right of way was not an *exclusive* right of way.    Afterwards oil was struck on other portions of said Gale tract of land; and he proposed to this company, that,

if they would lay a pipe-line to these new points of production, he and his wife would grant them an exclusive right of way through this "Gale tract," so far as it lay in Ritchie county. This was agreed to, and the contract and grant dated January 31, 1870, was executed, and subsequently the contract and grant of like kind, so far as the "Gale tract" lay in Wood county, was executed on October 25, 1873. Under these contracts this company laid down pipes-lines to a large number, probably to fifty wells on this "Gale tract."

On June 26, 1875, E. L. Gale and wife conveyed a moiety of one thousand acres of this "Gale tract" for eight thousand one hundred and forty-six dollars and fifty cents to persons since constituting the Wood County Petroleum Company; and they believing that the West Virginia Transportation Company was exacting from them and their tenants illegal charges for transportation; and by mixing different oils and by other violations of their charter injuring them, concluded to lay down pipes to the various wells on their part of this "Gale tract," and connect them with the pipes of the Ohio River Pipe-Line Company, another corporation organized for transporting oils. This was about being done, when it was prevented by the injunction awarded in this suit.

These facts show, that the grants and contracts of January 31, 1870, and October 25, 1873, made by E. L. Gale and wife to and with the West Virginia Transportation Company, while ambiguous on their face when interpreted by the aid of the circumstances of the case, and the situation and conduct of the parties in carrying them out were designed not only to confer on the West Virginia Transportation Company the right of way for their pipes through this "Gale Tract of two thousand acres in Ritchie and Wood counties but also to confer on them the *exclusive* right of way, that is to say, to bind the grantors in their deeds and contracts not themselves to use pipe-lines to transport oil from said "Gale tract" and not to grant to any other person or persons authority to lay pipe-lines through said "Gale tract" to transport petroleum oil produced either on it or any other lands. That this is the true interpretation of these grants and contracts is, I think, apparent from *Western Union Telegraph Co.* v. *Chicago and Paducah Railroad Co.*, 86 Ill. 246,

(29 American R. 28) and from *Western Union Telegraph Company* v. *American Union Telegraph Company*, 65 Ga. 160 (38 American R. 781).

It remains for us to decide, whether these are such contracts, as the court ought on the application of the West Virginia Transportation Company to enforce against the obligors or those claiming under them, assuming that those so claiming are doing so with notice, at the time they purchased, of these grants and contracts with the West Virginia Transportation Company and of the character of their claim under these contracts.

The reason why, it is insisted by the counsel of the appellees, these contracts ought not to be enforced is, that they are contrary to public policy. The common law will not permit individuals to oblige themselves by a contract either to do or not to do anything, when the thing to be done or omitted is in any degree clearly injurious to the public. (*Chappel* v. *Brockway*, 21 Wend. R. 159.) It is upon this principle that it is settled, that contracts in restraint of trade are in themselves, if nothing shows them to be *reasonable*, bad in the eye of the law; and though such contract be for a pecuniary consideration, or, what is the same thing, though it be under seal and stipulate only that a certain trade or profession shall not be carried on in a *particular* place, if there be no recitals in the deed or contract or no averment and proof showing circumstances, which render such contract *reasonable*, the contract or instrument is void, though it be but in *partial* restraint of trade. (*Horner* v. *Graves*, 7 Bing. 744; *Pierce* v. *Fuller*, 8 Mass. 223.) Contracts in restraint of trade are for the most part contrary to sound policy and are consequently to be held void. This is the general rule. There may be cases, where the contract though in apparent restraint of trade to some partial extent is neither injurious to the public at large nor even to the obligors, and when this is made to appear affirmatively, the courts hold such contracts valid though apparently to some extent in restraint of trade. If the contract go to the total restraint of the trade in the State, where it is made, it is necessarily void, whatever be the condition on which it was based. Such a contract must be injurious to the citizens of the State, in

which it is to operate.    For however small the State in which
he was, the man making such contract would at least compel
himself to transfer his residence and allegiance to another State
in order to pursue his avocation.    (*Chappel* v. *Brockway*, 21
Wend. 159; *Taylor* v. *Blanchard*, 13 Allen 374; *Dunlap* v. *Gregory*, 10 N. Y. 241; *Horner* v. *Ashford*, 3 Bing. 328; *Mitchel* v.
*Reynolds*, 1 P. Wms. 181; *Alger* v. *Thacher*, 19 Pick. 51;
Smith's Leading Cases vol. 1 Part 2 p. 508.)    On the other
hand if the contract be but in *partial* restraint, it may not be
invalid; for there may be good reason, so far as the public in-
terest is concerned, for allowing parties to contract for an ap-
parent limited restraint, as that a man will not exercise his
trade or profession in a *particular* place.    And if such good
reasons are shown, such contract will be upheld as not con-
trary to public policy. (*Chappel* v. *Brockway*, 21 Wend.
159; *Ross* v. *Sadgbeer* 21 Wend. 166; *Lange* v. *Werh*, 2
Ohio State R. 420.)    I presume that it is not absolutely nec-
essary however, that such good reasons should be set out on
the face of the contract.    I suppose this might be averred in
the pleadings and proven.    *Ross* v. *Sadgbeer*, 21 Wend. 168;
*Mitchel* v. *Reynolds*, 1 P. Wms. 181, and *Horner* v. *Ashford*,
3 Bing. 322.)

Though a contract in restraint of trade be in all other re-
spects *reasonable*, and be not otherwise in any manner preju-
dicial to either the public or the obligor, yet the simple fact,
that it restrains trade over an *unreasonable* extent of territory,
though it be not a *general* restraint of trade, will render such
contract invalid as contrary to public policy.    Thus in *Law-
rence* v. *Kidder*, 10 Barb. 641, the court held, that a contract,
whereby the party covenanted that he would not sell mat-
tresses in New York west of Albany, was held because of
the large extent of the territory, in which this restraint
operated, as contrary to public policy and void.    But while
the burden is on the party claiming the benefit of every con-
tract in restraint of trade to show, that under the particular
circumstances of the case the partial restraint of trade is of
no prejudice to the public, yet by what circumstances this
burden would be met would seem to be difficult to state, and
has apparently depended a good deal on the particular judge,
who has had to pass judgment on the circumstances.    Thus

in *Whitney* v. *Slayton*, 40 Me. 231, the court held, that "an agreement not to engage in the business of iron-casting within sixty miles of Calais for the term of ten years" was valid; but they based their judgment in part on the fact, that much of the country within sixty miles of Calais was but sparsely settled, and there were but few places of business within this territory, and also in part on the fact, that Calais was on the extreme border of Maine.

In *The Oregon Steam Navigation Company* v. *Winsor*, 20 Wall. 64, the court laid down the rule in such cases in a manner substantially corresponding with the views which I have expressed in the syllabus, saying "Questions about contracts in restraint of trade must be judged according to the circumstances, in which they arise, and in subservience to the general rule, that there must be no injury to the public by its being deprived of the restricted party's industry, and that the party himself must not be precluded from pursuing his occupation and thus prevented from supporting himself and family." But in applying these principles the court held, that when A., engaged in navigating waters in California alone, sold in 1864 a steamer to B. who was engaged in the business of navigating the Columbia river in Oregon and Washington territories, and B. agreed that for the period of ten years he would not employ this steamer in the waters of California, the contract was not void, this stipulation being reasonable and not prejudicial to the public interest, as the vender of the steamer, who thus contracted not to navigate with it the waters of California, proposed, when he purchased it, to navigate with it the waters of Puget sound.

In *Wright* v. *Ryder*, 36 Cal. 342, a California company engaged in navigating the waters of California sold one of its steam-boats to an Oregon company engaged in navigating Oregon waters, and the purchasers agreed not to navigate the waters of California for ten years with this steam-boat; and the court held this contract to be void, being contrary to public policy and an unreasonable restraint of trade.

In all such cases the difficulty lies in determining what are reasonable and what unreasonable restrictions in respect to the area, within which the trade is to be confined. As is said by Justice Bradley in the *Oregon Steam Navigation Com-*

*pany* v. *Winsor*, 20 Wall. 69, " It is obvious on first glance, that what is a reasonable restraint must depend upon the circumstances of the particular case ; although from the uncertain character of the subject much latitude must be allowed to the judgment and discretion of the parties. It is clear, that a stipulation, that another shall not pursue his trade or employment at such a distance from the person to be protected, as that it could not possibly affect or injure him, would be unreasonable and absurd. On the other hand, a stipulation is unobjectionable and binding, which imposes the restraint to only to such an extent of territory, as may be necessary for the protection of the party making the stipulation, provided it does not violate the two indispensable conditions, that the other party be not prevented from pursuing his calling, and that the country be not deprived of the benefit of his exertions."

I will here say, that this last condition is the one which the courts must ever keep in view, that is, that the restriction is not prejudicial to the interest of the public. If it is, the contract is contrary to public policy and will not be enforced. The cases show, that whether the public interest is prejudiced by a contract, which restricts a business or profession within *partial* limits, will often depend very largely on the character of the profession or calling. Thus in *Bunn* v. *Guy*, 4 East 190, a contract made by an attorney, solicitor and conveyancer, that he would not practice his profession in London or within one hundred and fifty miles thereof, was held valid as not an unreasonable restriction; but in *Sainter* v. *Ferguson*, 7 Man., G. & Scott 716, (62 Eng. Com. L. R.) the question was discussed whether Macclesfield or within seven miles thereof was a reasonable restriction, within which a surgeon and apothecary was to be restrained from practicing his profession, the court holding that it was. The reason why the courts regard as a reasonable restriction to the practice of the legal profession a territory so much larger than would be allowed as a reasonable restriction to the practice of a surgeon's profession is obviously because a lawyer can practice his profession effectually at a long distance from his residence, say fifty or one hundred miles, by correspondence and occasional visits, while a surgeon can practice his profession at

but a short distance from his residence, as nothing can be done by him except by personal visits. The public therefore may not be injured by a lawyer being required to live fifty miles distant, while they would be entirely deprived of a surgeon's services, if he was required to live at that distance from them.

According to the modern and better authorities, if the restriction of the particular trade or business be partial and *reasonable*, when all the circumstances are considered including the restriction and object of the parties and the nature of the business, which is restricted, as well as the extent or the restriction in reference to time and space, then such contract imposing such reasonable restrictions will be upheld without regard to the adequacy or inadequacy of the consideration. (*Hitchcock* v. *Coker*, 6 A. & E. 438; *Leighton* v. *Wales*, 3 M. & W. 545; *Archer* v. *Marsh*, 6 A. & E. 959.) In *Pilkington* v. *Scott*, 15 M. & W. 657, the law is thus stated by Alderson, B.: "That if it be an unreasonable restraint of trade, it is void altogether; but if not, it is lawful; the only question being whether there is a consideration to suppo it. and the adequacy of the consideration the court will no quire into, but will leave the parties to make the bargains for themselves.   Before the case of *Hitchcock* v. *Coker*, 6 A. & E. 439, a notion prevailed, that the consideration must be adequate to the restraint; that was in truth the law making the bargain instead of leaving the parties to make it and seeing only that it is a reasonable and proper bargain." And this is the law in this country.   See *Hubbard* v. *Miller*, 27 Mich. 15.  *Guerand* v. *Dandelet*, 32 Md. R. 562.  It may be regarded as established as a general rule, that when a covenant in restraint of trade is reasonable and is valid at common law, it will be specifically enforced in equity by enjoining the obligor from violating such covenant.  See *Harrison* v. *Gardner*, 2 Madd. R. 444; *Whitekar* v. *Howe*, 3 Beav. 383; *Guerand* v. *Dandelet*, 32 Md. 562; *Beard* v. *Dennis*, 6 Ind. 200; *Butler* v. *Barleson*, 16 Vt. 176.

The cases establish, that the restrictions, which may be put upon any trade or business, are only such as in the judgment of the courts will not be prejudicial to the public; and that the extent of the restriction allowed must therefore de-

pend largely on the character of the trade or business. In most cases the trade or business has been strictly local in its character, and a contract prohibiting one from engaging in such strictly local business, which is held to be valid, has been only such as prohibited the obligor from engaging in such business in a particular place, as a named town or city. To permit the obligee to stipulate that the obligor should not engage in such strictly local business in an extent of country exceeding the bounds of a given town or city would be to permit him to enforce a contract clearly prejudicial to the public interest. According to the spirit pervading the decisions everywhere a barber would be allowed to make a contract, whereby the obligor should not be allowed to carry on a business in opposition to the obligee in a certain village, town or city. But if the contract prohibited the obligor from carrying on such a business in such town or village or for a space of ten miles around it, such a contract would be no doubt held to be void, so far as it restricted the obligor from engaging in the business outside of the limits of such town or village, though according to the decisions such con- would be enforced, so far as it restricted the business within the limits of the town or village. (*Price* v. *Green*, 16 M. & W. 346; *Chesman et ux.* v. *Nainby*, 2 Strange 739; *Woods* v. *Benson*, 2 Cromp. & J. 94; *Mallan* v. *May*, 11 M. & W. 653; *Nicholls* v. *Stretton*, 10 Q. B. 346; *Oregon Steam Navigation Company* v. *Winsor*, 20 Wall. 70; *Lange* v. *Werk*, 2 Ohio St. 520; *Horner* v. *Graves*, 7 Bing. 738; *Guerard* v. *Dandelet*, 32 Md. 561.) The reason for such holding is obvious; for as a barber could not have customers for a space of ten miles around his shop, such a restriction on another person could be of no possible benefit to the obligee in such a contract, while it might obviously injure the public by depriving another community of the services of a barber. But if the restriction was confined to a village, the contract would be upheld, as it might be actually of benefit to the inhabitants of a village, that the business of barbering should not be overdone, and as a village could support but one barber, the villagers would probably be better served, if only one attempted to do such business in the village.

But on the other hand the courts might uphold as valid a

contract in which the obligor bound himself not to engage in the business of a surgeon-dentist or milkman within ten miles of a village for such a circuit is not greater than could be reasonably occupied by a person engaged in business of this description.   (*Cook* v. *Johnson*, 47 Conn. 175; *Proctor* v. *Sargent*, 2 M. & G. 31.)   If the business was that of iron-making, the extent of country, within which the court would permit an iron-founder to restrain another from engaging in the business, would be still larger.   Thus in *Whitney* v. *Slayton*, 40 Me. 224, the court upheld a contract, which prohibited the obligor from engaging in a business of this character for a space of sixty miles around Calais.   But this it is believed is a space greater than would under ordinary circumstances be allowed to be included in such a restriction in this sort of business.   A lawyer has been allowed to stipulate with another, that the obligor should not practice in London or within one hundred and fifty miles thereof; (*Bunn* v. *Guy*, 4 East. 190); and in *Whittaker* v. *Howe*, 5 Beav. 383, the court went still further, upholding a contract, which prohibited an attorney from practicing in Great Britain for twenty years. It is believed, that such contract ought to be held as prejudicial to public interest and void; but there is no question, that the restriction in point of space upon the practice of the legal profession would be allowed to an extent much greater than in most professions or occupations, as the profession of law can be well carried on over an extent of country much larger than most professions or occupations.   There is however one sort of business which requires for its proper prosecution a still larger extent of territory than even the profession of a lawyer, that is, navigating or steam-boating; and accordingly the courts have shown a disposition to uphold contracts prohibiting an obligor to engage in this character of business over a very large extent of territory.   Thus the Supreme Court of the United States in *Oregon Steam Navigation Co.* v. *Winsor*, 20 Wall. 64, upheld a contract, which prohibited the obligor from navigating with a particular boat the waters of the State of California.   But the supreme court of California in *Wright* v. *Ryder*, 36 Cal. 342, refused even in the case of steam-boating to uphold a contract, which went to this extent in restricting steam-boating.

The cases almost universally lay down the rule, that any contract, whereby any obligor stipulates, that he will nowhere engage in any specified business, will be held void as against public policy; but to even this rule there are exceptions, it being regarded by the courts that there are some species of employments which may be legitimately subjected to such general restraint.   For instance, this rule is held not to extend to a business, which is secret and not known to the public.   The public is regarded as not being prejudiced by a contract restraining generally such a business, because the public has no rights in the secret.   (*Bryson* v. *Whitehead*, 1 Sim. & Stu. 74; *Peabody* v. *Norfolk*, 98 Mass. 452.)   It has been held too, that, if a party purchase out a magazine, he may stipulate with the vendor, that he shall not publish another periodical of a like nature though this restriction be general.   (*Ainsworth* v. *Bentley*, 14 Weekly Rep. 630; *Ingram* v. *Stiff*, 5 Jur. (N. S.) 947.)   So too in *Stiff* v. *Cassell*, 2 Jur. (N. S.) 348 it was held, that a party might agree to write a tale for a periodical, and that he would not write another for any other periodical for a year.

In *Leather Cloth Co.* v. *Lorsont*, Law Rep. 9 Eq. 345 and *Morse Twist Drill and Machine Co.* v. *Morse*, 103 Mass. 73, these principles are laid down, that while contracts are void, if their object is to deprive the State of the benefit of the labor, skill or talent of a citizen, yet public policy requires, that when a man has by skill or other means obtained something, which he wants to sell, he should be at liberty to sell it in the most advantageous way in the market, and in order to enable him to do this, it is necessary that he should be able to preclude himself from entering into competition with the purchaser, provided the restriction is not unreasonable by going beyond the extent to which it would be a benefit to the purchaser.   If a general restraint in such a case is necessary for the benefit of the purchaser, it will be enforced, if inserted in the contract.   In such cases the public interest on the whole is regarded as not prejudicial but rather promoted by even a general restraint, if necessary to enable the inventor to realize from his invention; for the public are interested, that inventors should be fairly compensated.   On the other hand the cases lay it down as a general rule, that

any trade or business may be subjected by contract to a *partial* restraint, provided that the restraint, to which it is subjected, is so limited as that it may benefit the public or at least not be prejudicial to the public interest; and the cases show that the extent, to which this restraint may be legally imposed, depends largely upon the character of the business restrained.

From the principles, which underlie all the cases, the inference must be necessarily drawn, that if there be any sort of business, which from its peculiar character can be restrained to no extent whatever without prejudice to the public interest, then the courts would be compelled to hold void any contract imposing any restraint however *partial* on this peculiar business, provided of course it be shown clearly, that the peculiar business thus attempted to be restrained is of such a character, that any restraint upon it however *partial* must be regarded by the court as prejudicial to the public interest.

Are there any sorts of business of this *peculiar* character? It seems to me that there are, and that they have been recognized as possessing this peculiar character both by the statute-law and by the decisions of the court. Are not *railroading* and *telegraphing* forms of business, which are now universally recognized as possessing this *peculiar* character? Look at the Legislature of our own State in reference to these sorts of business and see if it does not distinctly recognize them as possessing this *peculiar* character. Our statute-law provides for the condemnation of lands by railroad and telegraph companies; and by pursuing the provisions of the statute-law these companies may acquire lands for their purposes without the consent of the owners of such lands. (Ch. 52 and ch. 42 of the Code of West Virginia.) In conferring on such companies the power to exercise at their pleasure the State's power of eminent domain and the power thus to take land without the owner's consent for railroading and telegraphing the Legislature has emphatically declared, that the business of railroading and telegraphing is business in which the people of the State have such great and direct interest, that no individual land-owner shall prevent this business of railroading and telegraphing being carried on at every locality in the State, where any company may choose to en-

79

gage in such business. After such a legislative declaration the courts could not say, that in any particular locality however limited the public had not such a direct interest in railroading and telegraphing, that its interest would not be prejudiced by any person or corporation entering into a contract with another, whereby the obligor should bind himself to impede the making of such railroad or telegraph through any locality however small by refusing to grant a right of way through such locality or by refusing to permit a railroad or telegraph to pass through such locality. Such a contract would be necessarily prejudicial to the public interest as the Legislature has recognized the public interest to have a telegraph or railroad through every parcel of land as so clear, as to justify the condemnation of every such parcel of land without any kind of enquiry as to the public utility of the particular railroad or telegraph through that parcel of land.

The statute law assumes as self-evident, that the public interest is promoted in the building of a railroad or telegraph through each particular parcel of land; and the courts must therefore act on this assumption in every case, and as a consequence upon the principle, that the public interest is promoted by the business of railroading and telegraphing being done on each parcel of land, the courts must hold in accordance with the principles underlying all the decided cases, that no person or corporation can restrict this business being done on any parcel of land, however small, by a contract, which by giving to another an exclusive right of way or in any other manner requires the obligor to refuse to permit the doing of such business on said land by any and all companies, who are willing to pay a just compensation for the land, which may be actually used in the doing of such business.

In the *Western Union Telegraph Company* v. *American Union Telegraph Company*, 65 Ga. 160, (38 Am. R. 781) it was expressly decided, that " a contract by a railroad company granting to a telegraph company the exclusive use and occupation of its right of way for telegraph purposes is void as in restraint of trade and against public policy." The court after first showing the public necessity for the telegraph says: " Shall the means then, by which information is transmitted, be monopolized by a contract? When such exclusive rights

exist, or such monopolies are established, the same should be done by legislative grant and not by an individual contract. Our judgment therefore is, that these contracts are especially made and entered into to cripple and prevent competition, and they thereby enable the party to fix its tariff of rates at a maximum, governed alone by the necessities of its patrons. Such contracts are not favored by the law; they are against the public policy because they tend to create monopolies and are in general restraint of trade." The latter words above quoted, "they are in general restraint of trade," may not be entirely accurate language, as the contract prevents the erection of another telegraph line only on the land of the grantors, which may be ever so small a parcel of land. But it is true that to some extent "such contract is in restraint of this telegraphing business;" and for the reasons, which we have given, any restraint of that *particular* kind of business is contrary to public policy and a prejudice to public interest. The court subsequently say truly : "The State's right of eminent domain extends over every foot of its territory, and the same is held by its owners in subordination to that fixed and co-existing right, and may be taken for public uses upon just compensation," (p. 784.) The inevitable inference from this is, that no one can give to a railroad or a telegraph company the exclusive right of way for a railroad or telegraph line through his land however small a parcel it may be. Such contract is contrary to public policy. And if it were a valid contract, it would defeat the State's right of eminent domain.

The foregoing decision is, as I understand the case, followed in the case of *Western Union Telegraph Co.* v. *Chicago and Paducah Railroad Co.*, 86 Ill. 246 (29 American R. 31). There the railroad company had contracted with the telegraph company, that it would furnish and distribute along its track cedar poles, and furnish all the labor necessary to erect the poles and place wires and insulators thereon, and furnish the labor to keep the telegraph-wire in repair, the wire, insulators, batteries and instruments and all other material being furnished by the telegraph company, the telegraph company to give the use of new patents. And the railroad company agreed to assure to the telegraph company, so far as it legally might, an *exclusive* right of way along the

railroad line and lands for commercial and public purposes, and agreed to discourage competition by withholding facilities and assistance, performing to competing lines its legal duty and no more. There was proof, which appears to have satisfied the court, that two lines of wire on the same telegraph-poles under the management of different companies could not be worked without serious annoyance and inconvenience and injury to each other. The court held, that this contract was valid and could be executed, so far as it prevented the railroad company from permitting another telegraph company from putting up wires on the same poles; but that it was contrary to public policy, if it was to be interpreted as preventing another telegraph company from erecting another line of poles along the railroad and placing on them another line of wires.

If I am right in the views, which I have expressed, it would be contrary to public policy for the owner of a water grist-mill to contract with another person the owner of a mill-site in the neighborhood, that he would not erect on it a water grist-mill, because the business of grinding corn like that of railroading is regulated by the statute-law as one in which the public has a direct interest, and the necessary land may be condemned for the erection of such water grist-mill.

We will now proceed to apply these principles of law to the case before us. Examining the contracts between Gale and wife and the West Virginia Transportation Company of date January 31, 1870, and October 25, 1873, the first thing which strikes us is, that while they are for the exclusive right of way and privilege to maintain lines of tubing for the transportion of oil, &c., through this Gale tract, yet these contracts expressly reserve the privilege to remove such tubing at the pleasure of the West Virginia Transportation Company. Now if we were to assume, that a proper contract might be made for such *exclusive* right of way, we should be compelled to hold, that these were not proper contracts, because of this proviso authorizing the West Virginia Transportation Company to remove at their pleasure this tubing, and of course at their pleasure to decline to transport the oil raised on this "Gale tract" of land. It is true that this does not make these contracts void because of a want of

consideration; for the trouble which the West Virginia Transportation Company was at in laying down this tubing would be a sufficient consideration to support these contracts, if they were contracts for such reasonable restraint of trade, as that they ought to be supported. But this provision, that this tubing might be removed at the pleasure of the West Virginia Transportation Company, itself made these contracts unreasonable restraints of trade, so far as the public and the fifty tenants on this "Gale tract" of land were concerned. The position of the public was, that no one by these contracts could with any convenience transport to market the oil made on this "Gale tract" of land except the West Virginia Transportation Company; and by these contracts they could cease to do so, whenever they pleased, and thereafter, as no one else could lay down tubing, the public would necessarily in a large degree be deprived of the oil, which would otherwise have been produced on this land. Even if a proper contract for this exclusive use of a right of way for such tubing could have been made, this would have made these contracts unreasonable restraints on trade, contrary to public policy and void.

But there are much more serious objections to these contracts than these provisions. And had these obnoxious provisions not been in these contracts, they must still have been held void as contrary to public policy. The West Virginia Transportation Company could not ask, that the courts should enforce these contracts against Gale and wife, much less against their assignees, because these contracts are void as contrary to public policy. It is an attempt to restrain trade of a particular form, which from its character is recognized by the statute as such a business as can not be restrained even partially. A business, in which the general public has such a direct interest, that the statute has provided, that it may be carried on upon any tract of land in the State without the owner's consent. Hence it follows, that any contract made by the owner intended in any degree to restrain this business is contrary to public policy. This business of transporting oil in tubes is, like railroading and telegraphing, a business recognized by our statute-law as one in which the public has so great and direct an interest, that

to promote it the statute authorizes the State's right of eminent domain to be exercised by any corporation to acquire a right of way for its tubing through any parcel of land in the State. And from what has been said it must follow, that no person can lawfully contract with any corporation for an *exclusive* right of way for tubing through his land, whereby oil is to be transported. For if he could, he would thereby defeat the State's right of eminent domain.

Our conclusion therefore is, that such a contract, so far as it confers on the corporation a right of way through the grantors' land is valid and binding on him and on every subsequent assignee or grantee of the land; but so far as it attempts to deprive the grantor or his assignee or any other corporation from exercising the right to lay other tubing through said land for the transportation of oil, such contract is wholly inoperative and void, being contrary to public policy and an unreasonable restraint on trade. I feel confident that I am justified in holding this attempted restraint on the original grantor and covenantor as inoperative and void for this reason and of course, if this be true, it cannot bind any subsequent grantee of the land, or impede any other corporation in acquiring in a legal manner a right of way for the transportation of oil through such land.

But even if such contract were obligatory on the original covenantor or grantor, it could not possibly be binding upon a grantee of the land or any other corporation seeking a right of way through such land. It is impossible to regard it as a covenant running with the land; and the grantees of the land, though they had the most explicit notice of such contract, would not be under any obligation to fulfill it. The effort is to construe this grant of an *exclusive* right of way as the equivalent of first, a grant by the grantors of a right of way for tubing for the transportation of oil, which it certainly is, and secondly, as a contract on the part of the grantors, that the corporation should for all time have the right to transport for legal charges in their tubes all the oil, which should thereafter be produced on the tract of land. It seems to me obvious, that this second supposed provision in this grant and contract cannot by any fair interpretation be found therein. For surely under this contract and grant the grant-

ors would have had a right to transport the oil produced on
said tract of land by wagon, had they chosen so to do.
There is nothing in this contract, which can fairly be inter-
preted to forbid their so doing.   But if we were to assume,
that the construction of this contract claimed is its true con-
struction, and that it is to be interpreted, as if it had express-
ly provided " that for value received the grantors, Gale and
wife, thereby stipulated, that the West Virginia Transporta-
tion Company should have a right forever thereafter at legal
rates of charges to transport all the oil produced on said tract
of land," and if we were to assume further, that the grant-
ors not only covenanted for themselves but for their assigns
to fulfill this stipulation, and still further, that the grantees
of this land, the persons known as the Wood County Petro-
leum Company, had express notice of this covenant and its
requirements, when they purchased this land, yet my con-
clusion is, that they would have been under no legal obliga-
tion to fulfill this covenant, and that a court of equity would
not have compelled them to perform it under an idea, that as
they bought with notice, good conscience required, that they
should fulfill this covenant, though under no legal obligation
to do so.

I say, that they would be under no legal obligation to ful-
fill such a covenant, for the simple reason that it is not a
covenant real running with the land.   The leading case on
covenants running with the land is *Spencer's Case*, 5 Rep.
16; (1 Smith's Lead. Cas. 115).   But this case throws com-
paratively little light upon the question we are considering.
For it was a case arising under a lease between landlord and
tenant.   It was a lease of a house and certain lands by deed
for twenty-one years; and by the lease the lessee covenanted
for himself and his assigns, that he would build a brick
wall on a part of the leased land.   The lessee assigned his
term to another.   The question involved was, whether the
assignee of this lease was bound to build this brick wall and
could be sued by the landlord in an action of covenant, if he
refused so to do.   The court decided, that he was bound to
build the wall, and that this was a covenant real running
with the land, and that he might therefore be sued upon it
by the landlord.   This decision was based on the ground

that the wall to be built was on the leased premises, and that the lessee had expressly bound himself and his *assigns*. The contrary conclusion would have been reached, had either the lessee bound himself only and not himself and his *assigns* or had the wall to be built been a wall to be built elsewhere than on the leased premises; for the assignee, though named in the covenant, is not bound by a covenant to do something, which is merely collateral, and which in no manner touches or concerns the land demised and assigned to him. But it was held, that if instead of an obligation to build in the future a brick wall, a thing not then in being, the covenant had extended to a thing *in esse* parcel of the land demised, such covenant would go with the land and bind the assignee of the land, though the covenant in its words only bound the covenantor or lessee and was not by express words extended to the assigns of the lessee. These distinctions have ever since been followed as law. See *Mayor of Congleton* v. *Pattison*, 10 East. 130; *Keppell* v. *Bailey*, 2 Myl. & K. 517; *Hurd* v. *Curtis*, 19 Pick. 459.

They have however but little bearing on the question we are considering, because the cases all show, that there is a great difference between a covenant in a lease, a question between landlord and tenant, and a covenant in an absolute conveyance of land, a question between grantor and grantee, where the point to be decided is, whether or not the covenant runs with the land, that is, whether it be a covenant real or merely a covenant personal. The decided cases lead to the conclusion that when the covenant is contained not in a lease but in an absolute conveyance, as in the case before us, or in an instrument of any sort other than a lease, the burden of a covenant can never run with the land, so as to bind in every case the purchaser of the land as assignee of the covenantor. The burthen of a covenant charging land made by the owner with an entire stranger to the land so charged will never run with the land or rest upon the parties taking the land by assignment. To charge the land with the burthen of any covenant, there must be some privity of estate between the covenantor and the assignee of the land so burdened. These conclusions are deducible from the cases of *Bally* v. *Wells*, 3 Wilson 28; *Keppell* v. *Bailey*, 2 Myl. &

K. 517; *Hurd* v. *Curtis*, 19 Pick. 462. They are also the conclusions reached by the editors, both English and American, of Smiths' Leading Cases in their commentaries on *Spencer's Case.*

Of course there is a distinction between a servitude or easement imposed on land and a covenant real running with the land; but this difference has not always been kept in view, and it is from losing sight of this difference, that the views, which I have above expressed, have been sometimes supposed not to accord with decided cases.

The following are some cases, which being misunderstood have been sometimes supposed not to consist with the views which I have expressed: *Tulk* v. *Moxhay*, 2 Phil. 774; *Whatman* v. *Gibson*, 9 Sim. 196; *Schreiber* v. *Creed*, 10 Sim. 35; *Woodruff* v. *The Water Power Company*, 2 Stock. 489; *Hills* v. *Miller*, 3 Paige 254; *Watertown* v. *Cowen*, 4 Paige 510, and *Barrow* v. *Richard*, 8 Paige 350. This whole subject is ably reviewed in *Brewer* v. *Marshall and Cheeseman*, 18 N. J. Eq. R. (3 E. C. Green) 337; and the conclusions reached are those, which I have above expressed. It is certainly true, that there is a class of cases, in which equity has charged the conscience of a purchaser of land with agreements relating to this land, when it was clear, that the agreement did not create a servitude or easement on the land, and when it was also clear, that the agreement or covenant did not run with the land. Thus, as laid down in 1 Story's Eq. Jur. § 395, if lands are held in trust, or the owner of lands is under contract to sell or lease them, and a subsequent purchaser has notice of these facts, he will in equity stand in the place of the grantor and be chargable with the same duties and contracts. The reason assigned by Judge Story § 395 is, that "In such cases the purchaser will not be permitted to protect himself against such claims, but his own title will be postponed and made subservient to theirs. It would be gross injustice to allow him to defeat the just rights of others by his own iniquitous bargain. He becomes by such contract *particeps criminis* with the fraudulent grantor." It may at first seem, that this class of cases bears a close resemblance to the case we are discussing, as here the grantors of the land, when they purchased it, are assumed to have

known, that the parties, from whom they purchased, had
agreed, that all the oil produced on it should be transported
by a certain corporation, and that for this the corporation
had paid a compensation to these grantors. But there will
be observed at a glance a marked difference between these
cases. The public have a great interest, that the lands of
the State shall not be burdened with all sorts of new obliga-
tions such, for instance, as that the product of a particular
parcel of land must be transported by some specified com-
pany to some particular city. It is obvious, that if these
fancy obligations can be imposed on lands at the pleasure or
caprice of the owner, it would necessarily greatly retard the
progress of the State, as it is obvious, that individuals would
in many cases impose on their lands for very inadequate
considerations, burdens which would not embarrass them
but would in all probability embarrass greatly subsequent
owners of the land, if they were compelled to comply with
them. And so far as the public interest is concerned, it is
obviously immaterial, whether these onerous obligations are
enforced by a court of law or by a court of equity. But in
the cases, to which Judge Story refers, it is obvious, that the
general public would be wholly unaffected, whether obliga-
tions of the nature of those, to which he refers, were enforced
by a court of equity or not; and therefore there is in such cases
much less objection to a court of equity compelling as a
matter of conscience the observance of good faith by a pur-
chaser, though in so doing it enforces what is no legal obli-
gation.

There are however other cases, in which a court of equity
has thus interposed, which are not so easily shown to be un-
exceptionable. Thus where there is an agreement between
the owners of several lots, that the buildings to be erected on
them shall not be applied to certain specified uses, courts of
equity here hold that such agreement is obligatory not
only on the owners, who entered into such agreement, but
also on their alienees, who have purchased with notice of
such agreement. (*Whatman* v. *Gibson*, 2 Sim. 196, and see
also *Tulk* v. *Moxhay*, 2 Phil. 774; *Coles* v. *Sims*, 5 De G. M.
& G. 1; *Mann* v. *Stephens*, 15 Sim. 377; *Western* v. *Macder-
mot*, Law Rep. 1 Eq. 499; *Bristow* v. *Wood*, 1 Coll. 480;

*Brouwer* v. *Jones*, 23 Barb. 153; *Coleman* v. *Coleman*, 7 Harris 100.) These cases seem to be based upon the equitable principle of preventing a party having knowledge of another's just rights from defeating them, and not that easements were created, or that the engagements, which had been entered into, were of such a nature as to run with the land. In one case in New Jersey, where the grantor put into his conveyance a covenant by the grantee, that he would reconvey to the grantor, whenever he, the grantee, actually quit the premises, and that the grantee in violation of this agreement conveyed to one having notice thereof, the court held, that, though this was a mere personal covenant, nevertheless a court of equity would enforce its performance by such purchaser with notice. (*Van Doren* v. *Robinson*, 1 C. E. Green 256; *Holsman* v. *Boiling Spring Bleach Co.* 1 McCarter 347 and *Rogers* v. *Danforth*, 1 Stock. 294.) These cases show, that a court of equity has sometimes imposed the burthen of a covenant relating to land on the alienee of lands, though it was not an easement on the land nor a covenant running with the land; and it may be difficult to deduce from the decided cases any very clear principle, on which a court of equity has acted in all these cases in imposing as a matter of conscience such burthen on the alienee of the land with notice. In my judgment it would be unwise to enlarge the sphere of action of courts of equity in this direction; and it may be found even necessary to restrict their action at least in some of the cases, which are not binding authorities upon us.

It seems to me that a broad extension of the application of the principle, upon which the courts of equity seem to have acted in some of these cases, would lead to much mischief. If, for instance, it was extended to the supposed case, which we are considering, it would be in a high degree mischievous, that is, to the case where the grantor has covenanted with the grantee a corporation, that he and every assignee of his land shall permit the grantee to transport the product of his lands to market. If we did this, we would in effect destroy the entire doctrine, which prevails in courts of law, that covenants will not run as a burden upon land, when it is sold and conveyed by the covenantor, a doctrine eminently whole-

some and a protection to public interest. It is enough that the burden of a covenant may run with the landlord and tenant. If it be, as suggested, broadly extended in effect by courts of equity, the owners of land may be expected to impress upon them all their varying notions, and then courts of equity would see that the lands should retain such impress in the hands of every subsequent purchaser. For example, the owner might covenant with a stranger, that he or his assigns would never cultivate wheat on the land or never build upon it a dwelling-house or would always have all the blacksmithing for such land done at a particular blacksmith shop or the grain raised on the land sold in a particular market or to a particular person. If such covenants are now made and broken, as it is a mere personal covenant, the only remedy is a suit against the covenantor. But if courts of equity get to enforcing the specific performance of such covenants by the purchasers of land, because they had notice of them, when they purchased, it seems to me, that a great public mischief will be thereby done.

As a general rule a court of equity could very properly decline to enforce specifically such covenants against purchasers of lands, though they had notice of them, when they purchased, because it cannot be said, that the purchasers have purchased the land knowing the existence of such covenant and then unconscientiously refused to fulfill it; for it may well be replied, that the convenantor, when he made such covenant, knew, that it was a mere personal covenant not running with the land, and that a purchaser of the land would not therefore be bound by such covenant; and knowing this, when he made the covenant, how can a court of equity properly say, that he has been wronged, when a purchaser refuses to do that, which the covenantor always knew he would not be bound to perform.

This whole subject has been considered by the court of appeals of New Jersey in the case of *Brewer* v. *Marshall and Cheeseman*, 19 N. J. Eq. 537 (4 C. E. Green). In that case the covenant was, that neither the vendor of the real estate nor his assigns would sell any marl from off the premises adjoining the tract conveyed. The court decided, that this was no easement or covenant running with the land; and

that a court of equity should not enforce it against the alience of the land intended to be burdened with this covenant, though such purchaser had notice of the existence of this covenant, when he purchased the land.    All the authorities, to which I have referred, were reviewed; and the conclusion reached was thus expressed by the court:

"From this review of the authorities, I am satisfied that a court of equity will sometimes impose the burden of a covenant relating to lands or the alienee of such lands on a principle altogether aside from the existence of an easement, or the capacity of such covenant to adhere to the title.    So far I think the law is not in doubt, and the only question in this case, which I have regarded as possessed of any material difficulty, is whether the covenant now in controversy is embraced within the proper limits of this branch of equitable jurisdiction.    The enquiry is, have courts of equity ever gone the length of enforcing contracts similar to the one now before us?    My conclusion is the question should be answered in the negative, and for the reasons following, viz:    First, because the enforcement of this covenant between the parties to this suit would establish a principle which must inevitably overturn, by the application of equitable principles, the entire doctrine which prevails in courts of law, that covenants, as a general thing, will not run as a burthen upon land. That this would be the result I think will become at once apparent to any person who will carefully compare the present covenant with those which have been decided to be incapable of enforcement as not running with the title.    It has been remarked and I think upon solid grounds, that with regard to mere legal remedies, there appears to be no authority for saying that the burthen of a covenant will run with land in any case except that of landlord and tenant. · Notes on *Spencer's Case*, 1 Smith's Leading Cases 138.    This is the admitted rule at law ; but if this complainant is to be relieved, then in equity we have the opposite rule, that all covenants touching land, which are known to the purchaser at the time of the transfer to him, become attached to the land, and will descend with the title under similar conditions to the remotest alienee.    The extent of such a doctrine is this, that the owner of land may impress upon it any of his notions, and equity

will see that the land retain such impress in the hands of every subsequent holder. Let us test the principle by example. A. is the owner of land, and he covenants with B. that neither he nor his assigns will ever raise any grain on this land or will ever permit a dwelling-house to be put thereon. It is clear, that at law such covenants as these will not become parcel of the land so as to fetter its devolutions. The remedy for their breach is intrinsically legal, is by suit against the original covenantor. But if an agreement that marl shall not be sold from a certain tract of land will pass as a burden upon the land in equity, it will be difficult to hold in the examples just put the same result is not to obtain. These incidents can be annexed to land as multiform and as innumerable as human caprice."

His second reason is, that this covenant was a restraint on trade, a reason fully as applicable to the case before us. Upon this subject Lord Chancellor Brougham thus expresses himself in *Keppel* v. *Bailey*, 2 Myl. & K. 517: "Assuming that the Keppels covenanted for their assigns of the Beafort Works, could they by a covenant with persons who had no relation whatever to these works except that of having a lime-quarry and a railway in the neighborhood bind all persons who should become owners of these works either by purchase or descent, at all times to buy their lime at the quarry and carry their iron on the railway; or could they do more, if the covenant should not be kept, than give the covenantor a right of action against themselves? Consider the question first upon principle. There are certain known incidents of property and its enjoyment, among others, certain burdens wherewith it may be affected, or rights which may be created or enjoyed with it, by parties other than the owner, all of which incidents are recognized by the law. But it must not therefore be supposed that incidents of a novel kind can be devised and attached to property at the fancy or caprice of any owner. It is clearly inconvenient both to the science of the law and to the public weal, that such a latitude should be given. There can be no harm in allowing men the fullest latitude in binding themselves and their representatives, that is their assets real and personal, to answer in damages for breach of their obligations. This tends to no.

detriment and is a reasonable liberty to bestow; but great detriment would arise, and much confusion of rights, if parties were allowed to invent new modes of holding and enjoying real property, and to impress upon their lands and tenements a peculiar character which should follow them into all hands however remote.   Every close, every messuage, might thus be held in a different fashion, and it would be hardly possible to know what rights the acquisition of any parcel conferred or what obligations it imposed.   The right of way or of common is of a public as well as of a simple nature and no one who sees the premises can be ignorant of what all the village knows.   (See *Ackroyd* v. *Smith*, 10 C. B. 164.)

"But if one man may bind his messuage and land to take lime from a particular kiln another may bind his to take coals from a certain pit, while a third may load his with obligations to employ one blacksmith's forge, or the members of one corporate body, in various operations on the premises, besides many other restraints as infinite in variety as the imagination can conceive.   For then there can be no reason whatever in support of the covenant in question which would not extend to every covenant that can be devised.   The difference is obviously very great between such a case as this and the case of covenants in a lease whereby the demised premises are affected with certain rights in favor of the lessor."

The reasons thus forcibly stated seem to me lead us necessarily to this conclusion, that the grants and contracts made by E. L. Gale and Mary Gale, his wife, to and with the West Virginia Transportation Company dated respectively on January 31, 1870, and October 25, 1873, referred to in the bill in this cause imposed on none of the defendants in this cause any obligation of any sort excepting simply the duty of permitting the West Virginia Transportation Company to peaceably enjoy the rights of way for its tubing through this "Gale tract" of land, an easement which had by these grants and contracts been conferred on them long prior to the time the defendants had any interest in said land, and of course the right to maintain a telegraph line along said tubing.

I conclude also that this right of way and the privileges

confirmed by the said contracts are not exclusive, but that despite these contracts the defendants, or indeed any other corporation, have a right to lay down tubing through said "Gale tract" of land for the purpose of transporting oil, so that it does not destroy the use of their piping by the West Virginia Transportation Company. The interference with it by competition is *dammum absque injuria.* The circuit court might therefore have very properly refused to grant the injunction, which was prayed for in this cause, and it ought to have dissolved the injunction, sustained the demurrer to the bill and dismissed it at the plaintiff's costs.

The answers to the bill contain much immaterial and impertinent matter, though much of it was brought out by immaterial and impertinent allegations in the bill. Some of these impertinent matters are the many allegations in the answer, which are made to show, that the plaintiff did not, as alleged in his bill, furnish rightful transportation through its tubing at lawful rates but the reverse. The questions involved in the issue made on these immaterial points by these allegations in the bill and answers are properly the subject of enquiry in another suit in this Court. The exceptions to the answers on account of these impertinences should have been sustained. And most of the evidence taken in the cause was taken to sustain or refute these impertinent allegations or to prove or disprove another matter equally unimportant, whether the Ohio River Pipe Line Company was acting in concert with the Wood County Petroleum Company in laying the lines of tubing intended to transport oil produced on this "Gale tract" of land. As the evidence clearly shows, that the laying of these pipes of tubing, by whomever laid, in no manner interfered with the tubing of the West Virginia Transportation Company except by its legal competition, it is clear according to our views, which I have expressed, that the West Virginia Transportation Company has no ground of complaint in this suit.

The final decree rendered by the circuit court of Ritchie county in this cause dissolving the injunction, which had been awarded the plaintiff, and dismissing the bill and adjudging, that the plaintiff pay to the defendants their costs expended in this suit, is correct and must be affirmed; and

the appellees must recover of the appellants their costs about their defence expended and thirty dollars damages.

JUDGES SNYDER AND WOODS CONCURRED.

AFFIRMED.