# CHARLESTON.

WILLIAMS *v.* BOARD OF EDUCATION OF FAIRFAX DISTRICT.

Submitted June 11, 1898—Decided  November 16, 1898.

1.  PUBLIC SCHOOLS—*Board of Education—Discrimination.*
    The law of this State does not authorize boards of education to discriminate between white and colored schools in the same district as to length of term to be taught.   (p. 201).

2.  PUBLIC SCHOOLS—*Board of Education—Compensation of Teacher—Discrimination.*
    Where a teacher has been employed to teach a colored  school by the trustees thereof, under the supervision of the board of education, and she teaches the same the full term of the other  primary schools in the same district, satisfactorily to  the patrons of such school, she is entitled to pay for her whole term  of service; and the  board of education cannot escape the payment thereof by interposing a plea that it had, by reason of  the school being a colored school, limited the term thereof to a  shorter period than the white schools in the same district.   Such discrimination, being made merely on account of color, cannot be recognized or tolerated, as it is contrary to public policy  and  the law of the land.   (p. 202).

Error to Circuit  Court, Tucker County.

Action by Carrie Williams against the  board of education of Fairfax district, in the County of  Tucker.   Judgment for plaintiff, and defendant brings error.

*Affirmed.*

C. O. STRIEBY, for plaintiff in error.

J. R. CLIFFORD and A. G. DAYTON, for defendant in error.

DENT, JUDGE:

Carrie Williams sues the board of education  of  Fairfax

District, in the County of Tucker, for three months' unpaid services as teacher of the colored school of Coketon, in said district, amounting to one hundred and twenty dollars, and also one dollar deducted illegally off of a previous month's salary for failure to return the term report required by law. The circuit court gave her judgment, and the board brings the matter to this Court, and now here interposes the following defenses:

1. That the individual names of the members of the board are set out in the summons and declaration. This was wholly unnecessary, and will be regarded as mere surplusage.

2. That her appointment as a teacher was not in writing, as required by section 13, chapter 45, Code. After the service has been rendered in a satisfactory manner to the patrons of the school, and the board has recognized and approved it by receiving her monthly reports, and paying her five months' salary, it is too late for them to object that her appointment was not in writing, as required by law.

3. That the trustees had not established a primary school as required by section 17, chapter 45, Code, the enumeration of colored children being twenty-six, but had apportioned the funds under section eighteen, *Id.*, assigning to the colored children their *pro rata* share. This is directly in the face of the positive mandatory requirement of the statute, and it is contrary to public policy to entertain such a plea. No public officer should be permitted to plead his own misconduct in defense of what would otherwise be a just legal claim against him. On the contrary, the court will presume that he faithfully discharged the duties of his office, in the very face of his plea, when such presumption appears proper. In this case the trustees established a colored school at Coketon; and it must be presumed that this was done in accordance with the provisions of section 17, and not section 18, chapter 45, Code. To hold otherwise would be to condemn the trustees as guilty of a plain failure of duty, subjecting them to the penalties imposed by section 59 of said chapter, which would be unjust to them in the face of the matters contained in the record. The trustees are not par-

ties in any wise to this suit, and it is hardly fair to them for the board to seek to defend itself by alleging neglect of plain mandatory duty on their part, if legally proper to do so, which is certainly not the law.

4. That, the people of the district having voted for an eight months' school, the board arbitrarily determined the white schools should run eight months, and the colored school only five months. This distinction on the part of the board, being clearly illegal, and a discrimination made merely on account of color, should be treated as a nullity, as being contrary to public policy and good morals. At the end of five months the board notified the teacher to stop the school, the only reason for so doing being their discriminating action towards the colored school. This she refused to do, but taught it, satisfactorily to the patrons of the school, the full eight months authorized by law. In the case of *West Virginia Transp. Co.* v. *Ohio River Pipe Line Co.*, 22 W. Va., 617, it is said: "The common law will not permit individuals to oblige themselves by a contract either to do or not to do anything when the thing to be done or omitted is in any degree clearly injurious to the public." On page 3 of Greenhood on Public Policy it is said: "The element of public policy in the law of contracts and in the law generally is by no means of recent origin, but owes its existence to the very sources from which our common law is supplied." "It secures the people against the corruption of justice or the public service, and places itself as a barrier before all devices to disregard public convenience." And on page 3: "By 'public policy' is intended that principle of the law which holds that no subject can lawfully do that which has a tendency to be injurious to the public or the public good." Hence no court will permit an otherwise just claim to be defended on the grounds of dereliction of duty or misconduct on the part of any public officer, because detrimental to the public service, and injurious to the common weal. As no individual can take advantage of his own wrong, so no public servant can take advantage of his own illegal conduct, or failure to discharge his official duties in accordance with the express provisions of the statute that creates him. Ignorance of law is no excuse, and violation

of law is no defense. Discrimination against the colored people, because of color alone, as to privileges, immunities, and equal legal protection, is contrary to public policy and the law of the land. If any discrimination as to education should be made, it should be favorable to, and not against, the colored people. Held in the bondage of slavery, and continued in a low moral and intellectual condition, for a long period of years, and then clothed at once, without preparation, with full citizenship, in this great republic, and the power to control and guide its destinies, the future welfare, prosperity and peace of our people demand that this benighted race should be elevated by education, both morally and intellectually, that they may become exemplary citizens; otherwise the perpetuity of our free institutions may be greatly endangered.

The board claim, however, that the proper remedy was by *mandamus*, and that the plaintiff had no right to take the law into her own hands. How much better was it for the patrons of the school, the board, and the public, that she should regard her employment as strictly in accordance with law, and disregard the illegal discrimination on account of color, and thus secure to her pupils their legal rights, without resort to the writ of *mandamus*, which, while it might have condemned and punished the board, would have been inadequate to furnish the relief sought. There is no question that she was employed to teach the school, and that she did teach it in accordance with law, and satisfactorily to its patrons. But the board says, it being a colored school, it was allowed its *pro rata* share of the funds, and limited to the period of five months. This action on its part, being without authority, and in direct disobedience of law, must be disregarded, and the board presumed to have discharged its legal duties.

Counsel insist that the colored pupils, having been allotted their *pro rata* share of the school funds, have no right to complain. The law guarantied them eight months of school, and, though it cost many times in proportion what the white schools cost, they should have had it. Money values should not be set off against moral and intellectual improvement. A nation that depends on its wealth is a depraved nation, while moral purity and intellectual pro-

gress alone can preserve the integrity of free institutions, and the love of true liberty, under the protection of equal laws, in the hearts of the people.   The judgment is affirmed.

*Affirmed.*