(55 Misc. Rep. 337.)

### WHITAKER v. KILBY et al.[*]

(Supreme Court, Special Term, Onondaga County. July 11, 1907.)

1. CORPORATIONS—ISSUE OF STOCK—INJUNCTION.

The directors of a corporation authorized the issue of 67 shares of its stock to increase its capital, and the superintendent reported that he had secured no subscriptions, whereupon four of the seven directors took the stock, without knowledge of the holder of a majority of the stock previously issued, who was also a director, but who was not present at the meeting when the stock was authorized. *Held*, that they would be enjoined from using such stock to his injury.

*Affirmed in 106 N. Y. Supp. 1149.

2. CONTRACTS—TELEPHONE COMPANIES—VALIDITY—RESTRAINT OF TRADE.

A contract between a telephone company and another telephone company, reasonably restricting its corporate activities, but not to such an extent as unduly to interfere with the public rights, is not invalid.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 11, Contracts, §§ 542–553.]

Action by James K. Whitaker against Allen E. Kilby and others. On motion for an injunction. Granted in part.

Elon R. Brown, for the motion.

John Conboy, W. A. Porter, C. E. Norris, and Edwin Nottingham, opposed.

ANDREWS, J. The Northwestern Telephone & Telegraph Company was incorporated in the state of Delaware in the year 1900, and immediately thereafter constructed a telephone line in the village of Carthage and the surrounding country. It was what is known as an "independent company," not affiliated with the various Bell companies. It had seven directors, of whom three constituted a quorum. In the year 1899 there had been organized in the city of Watertown the Citizens' Telephone Company, also an independent company. In this company the plaintiff held a large proportion of the stock and with his friends was in control. After the Northwestern Company was organized, apparently without any written contract, the wires of these two companies were connected in such a manner that the subscribers of the one could communicate with the subscribers of the other, and some arrangement for dividing the tolls of such messages was made.

The Central New York Telegraph & Telephone Company is what is known as a "Bell corporation." It has obtained from the American Bell Telephone Company the exclusive right to use in a large part of New York state the Bell telephone instruments and to connect with other so-called Bell telephone companies. In the year 1904, one W. K. Squires, who at that time owned a majority of the stock of the Northwestern Company, entered into negotiations with the Central Company for the sale of his stock. Thereupon the plaintiff, to prevent the injury which he feared would follow to the Citizens' Company, bought this stock himself. Mr. Squires, who was a director, resigned, and the plaintiff took his place upon the board. The other directors remained in office; and, as there has been since no annual election, they still continue, with the exception of one Flynn, who died, and whose place the directors themselves filled by the defendant Jenks. Thereafter the relations between the Northwestern and the Citizens' Companies continued as before.

A regular meeting of the board of directors was held on May 20, 1907. Kilby, Wilder, and Yousey were present. The plaintiff, who resides in the city of New York, and who had been ill prior to that time, was notified, but did not attend; nor did the seventh director, who resides in the state of Delaware and apparently has never been present at any meeting of the board. At that meeting a resolution was passed directing the president to execute a contract, which was then presented, between the Northwestern Company and the Central New York Company. Negotiations for this contract had apparently begun on or

about April 6, 1907, and various references had been made to it at subsequent meetings of the board. None of these meetings, however, had been attended by the plaintiff; and he had no knowledge or information as to such negotiations, or that such a contract was contemplated. The contract in question was immediately executed by Mr. Kilby, the president. At another meeting of the board, which was held on May 30, 1907, Messrs. Kilby, Wilder, and Yousey were again present. The authorized capital stock of the company consisted of 2,000 shares. Of this amount only 339 shares had been issued, the plaintiff holding 201 of these. The company was in urgent need of funds, and, ostensibly to raise the sums required, a resolution was passed that 67 shares be issued and sold at par, and that the superintendent be instructed to obtain subscriptions for that amount. Later the superintendent reported that he could not obtain subscriptions; and thereupon the 67 shares were subscribed for by the defendants Kilby, Yousey, Wilder, and Jenks, and issued to them. This was done entirely without knowledge on the part of the plaintiff, or any information to him that such action was contemplated; and the result was that it gave to the defendants slightly more than 50 per cent. of the stock of the corporation, turning the plaintiff from a majority to a minority stockholder. On May 30th, also before the plaintiff had been informed of the contract made with the Central New York Company, connection between the Citizens' and the Northwestern Companies was severed and connection with the Central New York Company was made.

The plaintiff attacks both these transactions, and asks for an injunction preventing the use by the defendants of stock so issued to them, preventing them from carrying out the contract of May 20, 1907, and requiring the defendants to reconnect the wires of the Northwestern and Citizens' Companies.

So far as regards the issue of stock, the plaintiff is entitled to relief. Directors cannot, with secret knowledge of the existence of a contract which they claim to be of great value, issue treasury stock of the corporation and buy it in themselves, particularly when the transaction converts them from minority to majority stockholders. Such a transaction is in the highest degree inequitable. All stockholders should be given knowledge of contracts affecting the value of the stock, and should be allowed to subscribe for their proportional share of the new issue. It may be that the issue itself was justified by the necessities of the corporation. It may be that the money received for it has been applied for the benefit of the company; but the equities of the parties can be determined on the final judgment rendered in this action. Meanwhile the defendants should not be allowed to use the stock wrongfully acquired by them to the detriment of the plaintiff.

A much more serious question is that involving the contract with the Central Company. By this contract the Central New York Telegraph & Telephone Company grants to the Northwestern Company the right to use the Bell telephone instruments in a certain defined territory in the neighborhood of Carthage. It is to lease to the Northwestern Company Bell instruments for use in that district at a fixed rate; to turn over to it its property situated in the district, except trunk lines, for a rental; to turn over to it all its subscribers in the district; and it agrees,

during the term of the contract, not to connect with any other telephone company therein. In return, the Northwestern Company agrees to turn over to the Central Company its property situated outside the district at a rental agreed upon; to substitute Bell instruments for those now used by it within three years; to turn over to the Central Company its subscribers outside of the district; to cut off all connection with lines not fully equipped with Bell instruments; to use only Bell instruments at public stations; and, finally, it agrees not to extend its system outside the district specified in the contract without the consent of the Central Company. The lines of the Northwestern and Central Companies are to be connected for the interchange of business, and a traffic agreement is made as to messages passing over the wires of both companies. The time of the agreement is fixed at thirty years.

The board of directors of a corporation represent not simply the stock which they may happen to own individually, but they represent the corporation itself. The business of the corporation is to be controlled by their judgment, and their judgment is not limited by the fact that it does not coincide with that of the majority stockholders. When they make in good faith a valid contract, the consent or the approval of the majority stockholders is not necessary. This particular contract in question, if valid, and if made in good faith, is binding upon the parties thereto, even though it may be disapproved by the plaintiff, even though it may injure his interests. The mere fact that he owns stock in the Citizens' Company, which company may be ruined by the contract in question, is no answer to this proposition. In fact, the minority stockholders in the Northwesetrn Company could rightfully object to any action on his part, even if he controlled the majority of its directors, which would tend to injure the Northwestern Company for the benefit of any private interests he might hold outside of it.

The first question to be considered, therefore, is whether this contract was entered into by the directors of the Northwestern Company in bad faith. Upon the papers before me I could not sustain such a charge. The denial to his representative, after it was executed, that any such transaction was even contemplated, and the illegal issue of stock on May 30th, apparently made for the purpose of transferring the control from one who might be expected to be unfavorable to the contract to those who favored it, while they raise some suspicions, are not sufficient. Nor is the contract itself so unreasonable and so unfavorable to the interests of the Northwestern Company as to be in itself proof of collusion or bad faith. In fact, the contract seems to be an advantageous one, and one essential to the continued prosperity of the Northwestern Company. The mere fact that the Citizens' Company have but 1,000 subscribers, of whom nearly 400 use also the Central's telephones, while the Central has nearly 3,000 subscribers in the city of Watertown, would in itself tend to show that a traffic arrangement with the latter, rather than the former, would be advisable. Taking all the facts together, the contract seems to show judgment on the part of the directors of the Northwestern Company.

But is the contract ultra vires or illegal in the sense that it is prohibited by law or by public policy? If it is, any stockholder may object. Clearly it is not by reason of the fact that the Northwestern Company

agrees to sever the connection between its wires and those of the Citizens' Company. No rule of law or policy requires one public service corporation to submit its property to the use of another. It may make or end such traffic arrangements at its option. If the contract is objectionable, it is because of the clause limiting the right of the Northwestern Company to extend its business beyond the territory defined therein.

It should be noticed that this is not a case where by its charter a transportation corporation is to extend its lines between two points and then agrees with a rival not to construct it for the whole distance. Such a contract might well be ultra vires. Nor, under the circumstances disclosed, does the contract seem to be an unreasonable one—one that would unduly limit the power of the Northwestern Company to serve the public. A telephone corporation need not do business throughout the state. The incorporators may specify and limit the territory to be occupied. Where, as in the case of a corporation organized under the laws of Delaware, such territory need not be specified, there seems to be no public reason against the corporation doing precisely what our statutes permit and require incorporators to do. Further, the territory assigned by this contract to the Northwestern Company, in view of its authorized capital and the cost of construction, seems practically all it ever can or will occupy. The limitation also constitutes no breach of faith with the public. Under its charter no one could insist that the lines of this company should be extended. No contract with the state is violated if it confines its operations to Carthage, or to some portion of Carthage. It is difficult to specify the "evident grounds" for anticipating public injury from this agreement.

The bare question is therefore presented whether, under any circumstances, a telephone corporation may, where such a course is not expressly or impliedly prohibited by its charter, where its charter permits it to do practically any business anywhere at any time, agree to limit a part of its activities within a certain district. I think it is clear that an individual or an ordinary business corporation may do so. The law permits contracts in partial restraint of trade, if they are reasonable—if they be such as only to afford a fair protection to the interests of the party in favor of whom it is given, and not so large as to interfere with the interests of the public. It is always to be remembered that the court should not interfere arbitrarily with freedom of contract. To justify its action, apprehension of danger to public interests should rest on clear grounds. In some tangible form the contract should threaten the public welfare. Diamond Match Company v. Roeber, 106 N. Y. 473, 13 N. E. 419, 60 Am. Rep. 464.

I think it is also clear that the same rule applies to a semipublic corporation, if it does not possess the power of eminent domain, and if no rights over the highways of the state are conferred upon it. Leslie v. Lorillard, 110 N. Y. 519, 18 N. E. 363, 1 L. R. A. 456; Lough v. Outerbridge, 143 N. Y. 271, 38 N. E. 292, 25 L. R. A. 674, 42 Am. St. Rep. 712. It may be very doubtful whether the Northwestern Company has that power. No corporation, foreign or domestic, may condemn property or may occupy the public highways, unless the right is conferred upon it by the Legislature. A statute claimed to grant the

right must be strictly construed. The Northwestern Company is a foreign corporation. Section 100 of the transportation corporations law (Laws 1890, p. 1152, c. 566) regulates the creation of domestic telegraph and telephone companies. Section 101 provides how such companies may extend their lines. Section 102 permits "such corporation" to erect its structures upon public highways or over private lands upon making compensation. If "such a corporation" means a corporation referred to in section 100, this act does not confer the right of eminent domain upon foreign corporations.

Sections 15 and 16 of the general corporation law (Laws 1892, pp. 1805, 1806, c. 687), provide for certificates authorizing foreign corporations to do business in the state. Section 17 provides that such corporations, doing business here, may acquire such real property in this state as may be necessary for their corporate purposes "in the same manner as a domestic corporation." This provision is hardly broad enough to confer the right of eminent domain. Nor am I willing to hold that it is conferred by the implied authority given by these sections to foreign corporations, when their certificates are filed, to do business in this state, although such a rule seems to be adopted in Missouri and Illinois. Southern Illinois & Missouri Bridge Company v. Stone, 174 Mo. 1, 73 S. W. 453, 63 L. R. A. 301.

I have been unable to discover any other statutes bearing on the subject. Nor do I find any decisions in point. In Telephone Company v. Marsh, 96 App. Div. 122, 89 N. Y. Supp. 79, Mr. Justice Chester refers to the transportation corporations law as giving such companies "organized under it" the power conferred by section 102. In New York, N. H. & H. R. R. Co. v. Welsh, 143 N. Y. 411, 38 N. E. 378, 42 Am. St. Rep. 734, it was held that foreign railroad corporations might condemn real estate, but solely because the various railroad laws gave that right to "all existing railroad corporations" and to "every railroad corporation." Possibly the Legislature may have withheld this power of set purpose. It may have been deemed unwise to encourage the formation of such corporations under laws perhaps less stringent than those prevailing here.

But I think the same result would be reached, even if we assume that the Northwestern Company possessed the power of eminent domain. It is claimed that a corporation vested with these powers owes certain duties to the public, greater or different from those of a line of steamers, for instance, which may be a common carrier, but which may not condemn land; that the state has a greater right to supervise its contracts; that certain contracts, perfectly legal between two steamship companies, or between one and its patrons, would be void as in restraint of trade or tending to monopoly if made between two railroad companies, or between one and its patrons. All this may be true. It may also be true that such a corporation, or any corporation, may not disable itself from the performance of those functions which were the consideration of the grant to it of its charter. But, when the further claim is made that the rule "that contracts in partial restraint of trade are not invalid does not apply to corporations in public business in which the public are interested" (Pingrey), or that, whenever the Legislature has authorized any corporation to condemn

the lands of others in order to carry on its business, the courts will regard this as a legislative declaration that it is against public policy to permit any restriction whatever of such business by private contract (West Virginia Transportation Company v. Ohio P. Lines Company, 22 W. Va. 617, 46 Am. Rep. 527), I dissent. This question has been discussed more fully in Central New York Telephone & Telegraph Company v. Averill, 105 N. Y. Supp. 378, a decision handed down by this court.

Briefly, contracts in restraint of trade are void if they are so unreasonable as unduly to interfere with the rights of the public. The test is not whether the corporation has the right of eminent domain, or whether its property is impressed with a semipublic use, but whether or not such rights are unduly affected. It may well be that a semipublic corporation might be unable to make contracts that would be perfectly valid if made by an individual or by a private corporation. But the reason is not because certain powers are conferred upon the former, but because, by the very nature of its operations, public interests are more likely to be affected. So long as the charter is not violated—so long as the public are not injured—any fair and reasonable contract of such a character is perfectly valid. Each case that arises must be decided upon its own merits and upon the particular circumstances developed.

As has been said, the contract in question here seems a reasonable one. The further question whether, assuming this particular clause to be illegal, the whole contract must be held void, need not, therefore, be discussed. W. U. Tel. Co. v. B. & S. Ry. Co. (C. C.) 11 Fed. 1.

An order may be entered granting the motion herein so far as the issue of the 67 shares of stock is concerned. As to all of the other matters the motion is denied.

Ordered accordingly.