■ ROBERT LICHTENBERGER et al., Respondents, v LONG ISLAND MACHINERY SALES CORP. et al., Appellants.—In an action (1) to declare null and void specified actions of the defendant corporation and (2) for a declaration of certain alleged rights of preferred shareholders of said corporation, defendants appeal, as limited by their brief, from all portions of a judgment of the Supreme Court, Suffolk County, entered June 6, 1978 except so much thereof as declared that "at the time of the shareholders' meeting of February 24, 1975 the voting power of the shareholders had not shifted to the preferred stockholders, and that the Fifth cause of action alleged by the plaintiffs must therefore fail." Judgment affirmed, insofar as appealed from, with costs. We find no basis for disturbing the findings of fact made by the trial court and further hold that defendants failed to meet the burden of establishing a lack of alternative means to accomplish the purported purposes for which stock options were granted (see *Schwartz v Marien,* 37 NY2d 487; see, also, *Dunlay v Avenue M Garage & Repair Co.,* 253 NY 274). Defendant Long Island Machinery Sales Corp. (Long Island), has been in continuous operation since the filing of its certificate of incorporation on June 21, 1954. The Island Cutter Corporation (Island Cutter), which employs plaintiffs Lichtenberger and Bryant, is 45% owned by Long Island and 55% owned by the November Corporation. The latter corporation, however, is a wholly owned subsidiary of Long Island. At the commencement of the trial the parties dictated various stipulations into the record. Among them were the following: "Item Number Two, that there is presently authorized two classes of stock, namely voting common stock and convertible non-voting preferred stock, the latter being convertible to common without time limitation on a share for share basis is also stipulated. Item Number Three, the plaintiff's statement is to the effect that as of January 18, 1975, the plaintiffs controlled 119,750 shares of the common stock and 76,121 shares of the convertible preferred stock of a total of 195,871. The defendants dispute that to the extent of approximately 27,500 shares which are ascribed to Roy Bryant, one of the plaintiffs, Charles R. Bryant, and it is the defendants' contention that the shares were not controlled by the plaintiffs since they were not fully paid for as of that date. As to Item Number Four, it is the plaintiffs' contention that as of January 18, 1975, the defendants controlled 150,179 shares of the common stock and 23,292 shares of the convertible preferred stock or a total of 173,471 shares. The defendants stipulate that they did control as to the common shares 150,179. However, the defendants do not join in the plaintiffs' contention that the defendants controlled as to the preferred shares 23,292 to the extent that the defendants make no claim as to 8,697 shares of that preferred stock. THE COURT: These are the items, some of which are going to be an issue in the hearing. MR. BEHRINGER [attorney for plaintiffs]: Yes, your Honor. THE COURT: All

right. MR. BEHRINGER: As to Item Number Five, there was perhaps—it might even be a typographical error, so I think we can set forth a joint stipulation that as of January 18, 1975, the Board of Directors of the corporation consisted of the plaintiffs, Lichtenberger, Burkhard and Bryant, and defendants John Donohoe, James Donohoe, Robert Donohoe—not Richard—Robert Donohoe, Ebner and Delurey. THE COURT: So that is an agreed stipulation? MR. HAND: So stipulated with that change. MR. BEHRINGER: Yes. THE COURT: All right." This appeal centers upon the propriety of actions taken by Long Island's board of directors at meetings held on January 18, 1975 and February 13, 1975 and actions taken by Long Island's shareholders at a meeting held on February 24, 1975. As a result of these three meetings, Long Island's board of directors was reduced from eight to five members; the individual defendants were elected as the sole directors of the new five-man board; plaintiffs Lichtenberger, Bryant and Burkhard were eliminated as directors; and options to purchase 70,000 shares each of the corporation's authorized unissued common stock, at a price of 10 cents per share par value were granted to defendants Wallace E. Ebner, John J. Donohoe and James E. Donohoe. The closing by the defendant directors of the stock transfer book for the first time in the corporation's 20-year history was the crucial means by which they placed beyond reach their majority voting stock control, which, up to that point, was subject to instant transformation into minority status with the plaintiffs obtaining majority status. It can be seen from the stipulated facts that as of January 18, 1975, the individual defendants (defendants) controlled the majority of common shares:

| | |
|---|---|
| Defendants: | 150,179 common shares |
| Plaintiffs: | 119,750 common shares (if, *arguendo,* plaintiff Bryant's 27,500 shares are included in plaintiffs' shares). |

Defendants claimed at the February 24, 1975 shareholders' meeting that Bryant's shares were never fully paid for. If, *arguendo,* we eliminate Bryant's shares, the respective common share interests would be:

| | |
|---|---|
| Defendants: | 150,179 common shares |
| Plaintiffs: · | 92,250 common shares. |

At first blush, it would appear that the inclusion of Bryant's shares in plaintiffs' shares would not affect defendants' common stock majority. However, since the preferred shareholders had the right to convert their shares into common shares, on a share for share basis, Bryant's shares do become crucial. Thus, if Bryant's 27,500 shares are excluded from plaintiffs' claim of 119,750 common shares, leaving a balance of 92,250 shares, plaintiffs, nevertheless, could convert the 76,121 shares of preferred stock controlled by them (see above stipulation) into common shares. This would give plaintiffs:

| | |
|---|---|
| Common shares prior to conversion | 92,500 shares |
| Preferred shares converted into common shares | 76,121 shares |
| Total common shares after conversion: | 168,621 shares. |

If defendants were to convert all 23,292 preferred shares which plaintiffs attribute to them, defendants would have:

| Common shares prior to conversion | 150,179 shares |
| Preferred shares converted into common shares | 23,292 shares |
| Total common shares after conversion: | 173,471 shares. |

If Bryant's shares were included in plaintiffs' shares, plaintiffs, by utilizing the conversion route, could change themselves from minority common share stockholders into majority common share stockholders.

| Plaintiffs: | |
| Common | 119,750 |
| Preferred | 76,121 |
| Total | 195,871 |
| Defendants: | |
| Common | 150,179 |
| preferred (inclusive of the 8,697 shares as to which defendants "make no claim") | 23,292 |
| Total | 173,471. |

As set forth in the stipulation, defendants "make no claim as to 8,697 shares of that preferred stock" which plaintiffs attribute to defendants. Thus, if we accept defendants' disclaimer, defendants, after conversion, would have only:

| Common shares prior to conversion: | 150,179 |
| Add preferred shares converted into common shares (23,292 less 8,697) | 14,595 |
| Total common shares after conversion: | 164,774. |

Whereas, even without plaintiff Bryant's shares, plaintiffs' postconversion totals would be, as noted, *supra:*

| Common shares prior to conversion | 92,500 |
| Preferred shares converted into common shares | 76,121 |
| Total common shares after conversion: | 168,621. |

It is thus clear that although defendants controlled the majority of the issued common stock (voting stock) as of January 18, 1975, it was an extremely fragile majority. At any time plaintiffs could have utilized the preferred stock conversion route to transform themselves into the majority and defendants into the minority. For defendants to have maintained control they would have had to increase considerably the number of shares controlled by them in contrast to those controlled by plaintiffs. This is precisely what defendants did, commencing with a directors meeting on January 18, 1975, notice of which was simply as follows: "Notice is hereby given that a Board of Directors meeting will be held January 18, 1975 (Saturday) at 4:00 PM at Long Island Machinery Sales Corp. offices at 568 West Hoffman Ave., Lindenhurst, New York." At that meeting, the five defendant directors out voted plaintiff directors Lichtenberger and Bryant to enact the following resolution: "The Chairman then said that for a great number of years Mr. W. F. Ebner had been serving the company faithfully and well and, because of the company's long standing poor cash position it was not possible to compensate him adequately nor was it possible to pay

him commissions and bonuses earned by him. For these and good sufficient reasons Mr. Ebner asked that he be permitted to purchase 70,000 shares of the unissued common stock of the corporation at the par value of $.10 a share and the Chairman advised Mr. Ebner he would place the matter for the consideration of the directors. Therefore, on a motion made by the Chairman and seconded by James E. Donohoe it was RESOLVED, that Wallace F. Ebner be permitted to purchase 70,000 shares of the unissued common stock of the corporation at the par value of $.10 a share. The foregoing resolution was passed as indicated by the following votes:

| For | Against |
| --- | --- |
| Robert W. Donohoe | Charles R. Bryant |
| John J. Donohoe | Robert Lichtenberger". |
| Albert J. Delurey | |
| James E. Donohoe | |
| Wallace F. Ebner | |

After the defendant directors voted at the January 18, 1975 directors' meeting to grant the 70,000 share option to defendant Ebner, the following motion was made at a January 24, 1975 directors' meeting (minutes filed by defendants): "Robert Lichtenberger made a motion, seconded by Charles R. Bryant, that, in view of past activities and devotion to duty shown by Messrs. Lichtenberger, Bryant and Burkard, they be allowed to purchase 70,000 shares each of common stock of Long Island Machinery Sales Corp. The motion was put to a vote and defeated, the directors having voted as follows:

| For | Against |
| --- | --- |
| Robert Lichtenberger | James E. Donohoe |
| John J. Burkard | Wallace F. Ebner |
| Charles R. Bryant | Robert W. Donohoe |
| | Albert J. Delurey |
| | John J. Donohoe". |

At the trial herein it was elicited that plaintiff Lichtenberger became a shareholder in Long Island in 1961; he was an employee of Long Island from approximately 1961 until 1963, at which time he began working for Island Cutter. He is a vice-president of Long Island. Defendant John J. Donohoe testified that while he and defendants Ebner and James E. Donohoe had loaned moneys to Long Island, *other* stockholders, including plaintiff Lichtenberger, had also done so; and Lichtenberger (as well as defendant "Mr. Donohoe") had guaranteed bank loans made to Long Island. (It was also elicited, however, that Lichtenberger was landlord of the building which housed both long Island and Island Cutter until Long Island moved out prior to the institution of this suit.) Further, it would appear from the testimony of plaintiff Bryant (now employed by Island Cutter) that Bryant had been working for Long Island or Island Cutter for nearly 20 years and that he agreed in 1956 to purchase $15,000 in Long Island stock, for which he paid $5,000 cash and gave a note for the balance. Bryant testified that the balance was to be reduced by credits for commissions: "Q Did you have any understanding with the corporation at the time that you signed the note as to whether or not there would be any credits to you? A At the time there was supposed to be a commission paid on sales and the balance was supposed to come out of commission because of the low draw that we were taking from the business." The crucial board of directors meeting was convened by the following simple notice: "February 10, 1975  Notice is

hereby given that a Board of Directors meeting will be held February 13, 1975 (Thursday) at 5:00 P.M. at Long Island Machinery Sales Corp. offices at 568 West Hoffman Ave., Lindenhurst, New York." At the February 13, 1975 directors' meeting, the minutes of the January 18 and 24, 1975 directors' meetings were read and the minutes as read were "Approved unanimously". John J. Donohoe then stated that: "Next order of business to call for Stockholders meeting on February 24, 1975, the purpose of which was to elect Board of Directors, discuss merger of Long Island Machinery Sales Corp. and November Corp., sale of Island Cutter Corp. and any other business that may be properly brought before Stockholders meeting." The minutes of the February 13, 1975 directors' meeting show that plaintiff Lichtenberger then "Requested that meeting be postponed because his lawyer was on vacation". Chairman John J. Donohoe denied the request. The motion calling for a stockholders' meeting was carried, the five defendant directors voting yes, the plaintiff directors, Lichtenberger, Bryant and Burkhard, voting no. Chairman John J. Donohoe then requested that a motion be made to "now close the books of transfer for 40 days." Defendant James E. Donohoe so moved; defendant Robert Donohoe seconded the motion. The motion was approved by the same 5 to 3 margin. On oral argument of this appeal, defendants' counsel conceded that this was the first time in the corporation's history that the stock transfer book had been closed. We note that the closing precluded plaintiffs from converting their preferred shares into voting common shares for the February 24, 1975 shareholders' meeting and thus barred plaintiffs from the possibility of converting themselves into a majority and defendants into a minority. At the trial, plaintiff Lichtenberger did concede that he had been aware of his conversion right and that prior to February 24, 1975 had never requested conversion. In our view, however, the trial court correctly concluded that: "As stated, the business of the corporation had been conducted on an extremely informal basis and the prime advocates and beneficiaries of this informality were the defendants. This informality was of such long duration that it became tantamount to custom and established procedure for the conduct of business. The plaintiffs were justified in relying on the continuation of such procedure. Indeed, they had no basis for being suspicious until the defendants changed the rules of the game. The defendants' argument that plaintiffs acquiesced to the loss of their rights of conversion is suspect. Prior to the defendants' action in closing the stock transfer book, the plaintiffs had no need to exercise such right, and afterwards they were unable to do so. In view of the above stated circumstances the Board's action of January 18, 1975 in submitting a stock option plan for the issuance of 70,000 authorized but unissued shares to the defendant Ebner, and the Board's actions of February 13, 1975 in immediately closing the stock transfer book for the first time establishes a prima facie case of unequal treatment of shareholders, and constituted a breach of the fiduciary duty owed by the defendant directors to all the shareholders." The February 24, 1975 shareholders' meeting was preceded by the following notice: "February 14, 1975 BY ORDER OF BOARD OF DIRECTORS: Notice of special Stock Holders Meeting to take place at the office of the Corporation at 5:00 PM February 24, 1975. PURPOSE: 1. Elect Directors. 2. Set date for annual meetings in future. 3. Discuss merger of November Corp. with Long Island Machinery Sales Corp. 4. Approve sale of Island Cutter Corp. 5. Discuss stock options. 6. Any other business to be brought before Stock Holders." The meeting opened with a request by plaintiffs Bryant and Rotchford that Bryant be allowed to tape record the meeting. The chairman denied the request. The

chairman then announced that the names and numbers of common shares entitled to vote were as follows:

"FULLY PAID
COMMON STOCK ENTITLED TO VOTE

| | | |
|---|---|---|
| J.J. DONOHOE | 51,127 | |
| J.E. DONOHOE | 51,127 | |
| W.F. EBNER | 97,925 | |
| J. BURKHARD | | 28,000 |
| P.J. ROTCHFORD | | 54,000 |
| E.J. ROTCHFORD, JR. | | 10,250 |
| R.W. DONOHOE | 10,000 | |
| DONOHOE CO. | 10,000 | |
| | 220,179 | 92,250 |

STOCK NOT ENTITLED TO VOTE

| | | |
|---|---|---|
| TREASURY | 4,000 | |
| CHARLES WOODAM | | 20,000 Not fully paid |
| C.R. BRYANT | | 27,500 Not fully paid". |

It is conceded in the brief submitted by the defendants on this appeal that Ebner's above-listed 97,925 common shares included the subject 70,000 shares resulting from the stock option previously granted to him by the board of directors. Thus, defendants had augmented their common stock voting shares by Ebner's 70,000 "option" shares and deleted from the voting shares claimed by plaintiffs, the 27,500 "Bryant shares". As already noted, by closing the stock transfer book on February 13, 1975, for the first time in the corporation's history, defendants had precluded plaintiffs from effectively converting their preferred shares in time to augment their vote at the February 24, 1975 shareholders' meeting. The remaining business at the February 24, 1975 meeting was conducted with dispatch. By a vote of defendants' 220,179 common shares to plaintiffs' 92,250 common shares, defendants (1) reduced the board from eight to five members, eliminating plaintiffs Lichtenberger, Burkhard and Bryant as directors and electing themselves as the new board; (2) approved the sale of Island Cutter, subject to the discretion of the board; and (3) voted to grant to defendants John J. Donohoe and James E. Donohoe options to purchase (at 10 cents par value) 70,000 common shares each, by virtue of long services to and financial sacrifices for the corporation. The minutes include the following bitter protestations from plaintiff Rotchford on behalf of the plaintiffs: "He [Rotchford] felt his position was as peacemaker between the two groups and to make his position clear on the illegality of the stock purchase option offered to Ebner. Chair asked if there was any other comments to be made. When none were made he asked for motion to approve actions of Board of Directors meeting of Jan. 18, 1975. Rotchford asked for motion to be reread as he was unsure of what he was voting on. Chair reread entire motion. * * * ROTCHFORD STATED THAT THIS WAS A power play to change control of company and effects [sic] his family interests. Have no doubt that there will be court action to defeat this illegal action. * * * Rotchford: I have same objections as before. Other people in this Corporation have worked as hard as you, myself included until I left Corporation and I am prepared to fight in any way possible to stop this illegal power play. Chair: Please don't threaten this Corporation. Rotchford: I am not Threatening but I want to be sure I'm heard. Chair: You have been given every opportunity to be heard not only at this meeting but by direct contact over the past 5 years to

review statements with your accountants and lawyers. Rotchford: I have been too busy to fool around with this. I have my own business to run. You have a lot of talk but no dough." We note that the parties stipulated "that the corporation has no regular stock option plan, and that except for the options granted to defendants Ebner, John Donohoe and James Donohoe, no stock options have been granted to any other employee or shareholder". In *Dunlay v Avenue M Garage & Repair Co.* (253 NY 274, 279-280, *supra),* the Court of Appeals stated: "Directors must always be free from fraud in their relations with their shareholders. Fair dealing is required. One formula of fair dealing is universally recognized, *i.e.:* Directors may not authorize the issue of unissued stock to themselves for the primary purpose of converting them from minority to majority stockholders. Such conduct, as indicated by Andrews, J., in *Whitaker v. Kilby* (55 Misc. Rep. 337; affd., 122 App. Div. 895), is inequitable in the highest degree. It involves a breach of the duty of the directors as fiduciaries representing all the stockholders, irrespective of any doctrine of pre-emptive right. 'Corporate directors cannot manipulate the property, of which they have control in a trust relation, primarily with the intent to secure a majority of the stock or of directors in any particular interest. This is not a fair exercise in good faith of the power with which they are clothed.' *(Elliott v. Baker,* 194 Mass. 518.) Before acquiring stock for such a purpose the directors should offer it at a fixed price to all the stockholders, sell at auction or obtain a waiver of their rights." At bar, defendants, by closing the stock transfer book for the first time and by issuing the stock options manipulated the corporate affairs so as to eliminate the very real contingency that plaintiffs, via preferred stock conversion, could take majority voting control and reduce defendants to a minority. Although defendants purported to justify their closing of the stock transfer book on the basis of the applicable by-laws and statutes, and purported to justify by statute the issuance of stock incentive options (see Business Corporation Law, § 505, subd [d]; § 622, subd [e], par [2]), we find from our examination of the evidence that defendants failed to meet the *double* burden imposed upon them by the rule set forth in *Schwartz v Marien* (37 NY2d 487, 492, *supra):* "Departure from precisely uniform treatment of stockholders may be justified, of course, where a bona fide business purpose indicates that the best interests of the corporation would be served by such departure. The burden of coming forward with proof of such justification shifts to the directors where, as here, a prima facie case of unequal stockholder treatment is made out. Particularly is this so when it appears that members of the board of directors favored themselves individually, over the complaining shareholder. Additionally, disturbance of equality of stock ownership in a corporation closely held for several years by members of two families calls for special justification in the corporate interest; not only must it be shown that it was sought to achieve a bona fide independent business objective, but as well that such objective could not have been accomplished substantially as effectively by other means which would not have disturbed proportionate stock ownership. Similarly, should the proof disclose double motivation on the part of the directors, that is, both to advance an independent corporate interest and at the same time to place a complaining shareholder at a disadvantage, the directors could then be absolved, if at all, of breach of fiduciary responsibilities only by accompanying proof *that no other means* were available appropriate *to the accomplishment of the corporate objective"* (emphasis supplied). The trial court correctly concluded that defendants failed to establish a bona fide independent business purpose. We further find that, other than self-serving state-

ments in the corporate resolutions of January 18, 1975 and February 24, 1975, and certain conclusory, vague and inadequate testimony by defendant John J. Donohoe as to the corporation's alleged prior cash poor financial position, there is absent requisite proof that there were no means available other than the grant of 210,000 in stock options to three of the defendants to accomplish the purported corporate objective. Accordingly, the judgment should be affirmed insofar as appealed from. O'Connor, J. P., Lazer, Gulotta and Mangano, JJ., concur.